No. 81-349

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

---

STATE OF MONTANA,

Plaintiff and Appellant,

-vs-

BRADLEY JAMES CARLSON,

Defendant and Respondent.

---

Appeal From: District Court of the First Judicial District, In and for the County of Lewis & Clark, The Honorable Gordon R. Bennett, Judge presiding.

Counsel of Record:

For Appellant:

Hon. Mike Greely, Attorney General, Helena, Montana
Charles Graveley, County Attorney, Helena, Montana
Kevin Meek and Carolyn Clemens argued, Helena, Montana

For Respondent:

Leaphart Law Firm, Helena, Montana
W. William Leaphart argued, Helena, Montana

---

Submitted: January 12, 1982

Decided: April 29, 1982

Filed: April 29, 1982

Thomas J. Kearney
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

The State of Montana appeals from an order of the District Court, First Judicial District, Lewis and Clark County, suppressing the use of certain evidence in criminal proceedings pending against the defendant Bradley James Carlson.

The issue brought by the State is whether the evidence is the product of a "plain view" observation of officers in the course of or incident to the making of a lawful arrest. We determine from the circumstances here that the evidence should be suppressed, and affirm the District Court.

On the afternoon of March 10, 1981, Carlson was involved in a minor traffic accident, in Helena, which was not his fault. Thomas J. Damon, the Helena city police officer who investigated the accident testified that he had heard "on the street" that Carlson was a drug user. When Officer Damon asked to see Carlson's driver's license at the scene of the accident, Carlson informed him that he had a valid driver's license but it was not with him. Officer Damon sought to verify the license status by use of his car radio through the state computer, but the computer was "down," and Officer Damon was unable to get verification. However, Damon informed Carlson that he would continue to check, and if Carlson was lying about his license, "I will be calling you or knocking at your door with a warrant."

At 9:00 p.m. of the same day, the computer was fixed, and from it Damon determined that Carlson was driving while his driver's license was revoked. He therefore made out, on Helena police department forms, a "Notice to Appear and Complaint" for the charge of operating a motor vehicle upon

a city street while having a revoked driver's license, and another "Notice to Appear and Complaint," for obstructing an officer by making false and untrue statements. Each of the notices required the defendant to appear before the municipal court on or before March 11, 1981, the next day.

Officer Damon was unable to get in touch with Carlson on the evening of March 10, or on the date of his required appearance, March 11. However, on March 11, he gave the citations to the city clerk to mail copies to the defendant. The proof in this case is that such copies were never mailed by the clerk to the defendant. On March 16, 1981, Officer Damon, thinking the citations had been mailed, requested that an arrest warrant be issued to the defendant because he had not appeared in court on March 11.

Each of the charges against Carlson was a misdemeanor. The Helena city judge issued a warrant ordering the arrest of the defendant on the misdemeanor charges against him. The warrant contains the notation "failed to appear on both citations" and further sets out the applicable bond on the charges, $150 for obstructing an officer, $25 for a revoked driver's license, $5 for a warrant charge, and court costs of $8, for a grand total of $188.

Under Montana statutes, the warrant of arrest may specify the amount of bail, section 46-6-202, MCA, and under another statute, section 46-9-303, MCA, a peace officer may accept such bail on behalf of a judge whenever a warrant for arrest specifies the amount of the bail.

The following day (March 17), the officer and another Helena police officer, Jeffrey G. Bryson, went to Carlson's home about 7:50 a.m. and arrested him pursuant to the warrant.

Carlson appeared at the door, clad only in his underwear, and half asleep. He was not read his Fourth Amendment rights.

In making the arrest, the officers entered Carlson's front room in circumstances described by Officer Damon:

> "Q. Would you describe to the court what happened when you arrived at the defendant's house with your arrest warrant that morning? A. He had--He came to the door, opened it up still half asleep and just in his underwear.
>
> "Q. And what happened then? A. Sergeant Bryson showed him the warrant for his arrest and said we have a warrant for his arrest, and that he was going to have to come to the police station with us.
>
> "Q. Did the defendant ask if he could get dressed first. A. Yes he did.
>
> "Q. And did you reply to him or did Officer Bryson reply to him? A. Sergeant Bryson did.
>
> "Q. And what did he say to him when he asked if he could get dressed first? A. He said, 'Sure, but you are under arrest' and one of us has to come with him and if we could come in the house, and which he opened the door to let us in.
>
> "Q. Did he ever tell you you could not come into the house? A. No, he didn't.
>
> "Q. Did he ever indicate to you that you were --that you were--that he did not want you present in his house? A. No, he didn't.
>
> "Q. Did he ever tell you to leave? A. No, he didn't."

The front door of the Carlson residence opened immediately into the front room or living room. Once inside the house, the officers observed on a coffee table a quantity of marijuana, some "bongs" (a street term for utensils used with marijuana) and other drug paraphernalia. However, the officers did not seize or touch anything. The defendant was taken to the city jail where he was "booked" under the two charges arising out of the traffic accident. There, for the first time,

Carlson was given copies of the "Notice to Appear and Complaint" on each charge. He posted the bond required of him and was released.

At police headquarters, the arresting officers related to their superiors what they had seen at the Carlson home. Officer Damon was dispatched to watch the Carlson house, while a search warrant was obtained from the county attorney's office. Thereafter, armed with a search warrant, a deputy county attorney, with police officers and sheriff's deputies, searched the house. The search produced small quantities of hashish, hashish oil, marijuana, cocaine, and a stolen pistol. Thereafter, Carlson was charged by information in criminal proceedings in the District Court with four counts of criminal possession of dangerous drugs, and two counts of theft, all felonies.

In the felony proceedings against Carlson, his counsel moved to suppress the evidence which had been produced as described above. The District Court concluded that Carlson's Fourth Amendment rights had been violated, and accordingly suppressed the evidence. It is from that order that the State appeals.

Carlson's motion to suppress in the District Court was upon two grounds, (1) that the entry of the officers into Carlson's home was without a search warrant, and without consent of Carlson; and (2) that the arrest on March 17, 1981, for a misdemeanor traffic offense that occurred seven days earlier was merely a pretext to gain entry into Carlson's home for the purpose of an investigatory search.

The State contends that the full custodial arrest of Carlson was reasonable under the circumstances, was not in connection with any pretextual arrangement to investigate

the Carlson home and that the search warrant upon the "plain view" observation of the police officers in the Carlson home was valid.

The District Court in its order declined to determine whether the arrest was a pretext for a search of Carlson's home, but also decided there was no necessity here for a full custodial arrest of Carlson based upon the misdemeanor charges against him. Instead, the District Court determined that the matter should be decided by what happened at the home after the arrest; to determine whether the defendant gave his consent to the officers to enter his front room under the totality of the circumstances, citing Schneckloth v. Bustamonte (1973), 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854. The court relied on four factual circumstances, (1) that Carlson was half asleep, (2) that he was under arrest, (3) that he had not been advised of his Fourth Amendment rights, and (4) he had been given the choice between going to the police station in his underwear at 8:00 a.m. or permitting the police to enter his home. The District Court determined that there was no evidence in the record that would support a conclusion that the defendant was not coerced by the circumstances and by the statements of the officers, and therefore his verbal consent did not qualify as voluntary to justify the "plain view" observation by the officers while they were in Carlson's front room.

One of the first matters for our determination is whether a "search" within the ambit of the Fourth Amendment occurred here. The State contended in the District Court that no search occurred. At least one of our dissenting brothers is of that opinion. Here the officers seized none

of the articles which constitute the evidence now to be suppressed. They noticed what was in the front room, in plain view and it is certain that there was no prying about in hidden places or looking under sofas by the two officers.

A "search" is a prying into hidden places for that which is concealed; conversely it is not a search to observe what is in plain view. Observations made upon invitation into a house are not a "search." State v. Monahan (Wis. 1977), 251 N.W.2d 421, 423.

The distinctive factor that turns an observation into a search, in the constitutional sense, is whether the person making the observation has a right to be in the place where the observation is made. Thus it is said that an observation made of a place where an officer has a right to be is not a search in the constitutional sense. State v. Seagull (C.A. Wash. 1980), 613 P.2d 528, 532; Fehlhaber v. State of North Carolina (D.C.N.C. 1980), 445 F.Supp. 130, 136; People v. Hauschel (Colo. App. 1975), 550 P.2d 876, 883; United States v. Coplen (9th Cir. 1976), 541 F.2d 211, 214.

The rule seems to be that evidence discovered in plain view from a place where officers are entitled to stand and where their claim to stand is not created as a pretext, solely to make legitimate otherwise impermissible intrusions, is not the subject of a "search" within the meaning of the Fourth Amendment, and seizing such evidence does not trigger a warrant requirement. United States v. Kaiser (5th Cir. 1977), 545 F.2d 467, 477.

It appears then that for constitutional purposes, a "search" may be defined as a visual examination, or the use of some other means of gathering evidence, which infringes upon a person's reasonable expectation of privacy. United

States v. Hartley (U.S.D.C. Fl. 1980), 486 F.Supp. 1348, 1354.

If therefore, the officers in this case were lawfully in Carlson's front room when they made the visual observations, a "search" within the constitutional sense did not occur; on the other hand, if their presence in the front room was not consented to, as the District Court determined, the visual examination does constitute a "search" in the constitutional sense.

The validity of the officers' entry into Carlson's front room is the fulcrum therefore on which this case turns. The State recognizes that the officers, in making the arrest, since Carlson was at the front door and within the arresting power of the officers, had no right to enter Carlson's house under the circumstances of this case. The State justifies their entry upon its claim of Carlson's consent. The District Court concluded that Carlson's consent was obtained, in effect, through coercion.

The District Court pointed out that there is a general presumption against waiver of a constitutional right, Johnson v. Zerbst (1938), 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466; and quoted from Schneckloth v. Bustamonte, supra, to the following effect:

> "But the Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion were applied the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed . . .
>
> "In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions as well as the possibly vulnerable subjective state of the person who consents."

Schneckloth, 412 U.S. at 228-29, 93 S.Ct. at 2048-49, 36 L.Ed.2d at 863-64.

We agree with the District Court. The subjective state of Carlson, admitted by the police officer to be "half asleep" and in his underwear, and the unqualified statement of the police officers that if Carlson were to get dressed, they would have to come into his house without any other explanation of his rights, constitute a subtle coercion of Carlson.

The very command of the Fourth Amendment itself is that searches must be reasonable, because it is "unreasonable" searches that are prohibited.

In order to show that voluntary consent to search was obtained, the State must show that the consent was unequivocal, specific, intelligently given and uncontaminated by duress or coercion. State v. Brough (1976), 556 P.2d 1239, 1241, 171 Mont. 182, 185; Sleziak v. State (Alaska 1969), 454 P.2d 252, 257-58, cert.den. 396 U.S. 921, 90 S.Ct. 252, 24 L.Ed.2d 202 (1969). This Court has held that there is a heavy burden of proof required to show that there was consent to a search. State v. LaFlamme (1976), 170 Mont. 202, 204, 551 P.2d 1011, 1012. Equivocal conduct alone is insufficient as a basis for inference of consent to a search, which consent is a waiver of a constitutional right.

As we stated in the foregoing discussion with respect to whether a search occurred here, if an element of a proper visual examination is that it is made from a point where the officers have a right to be, then we must conclude that the District Court was correct in determining that the defendant's consent was not shown by the State to have been voluntarily given, under the cases decided in our jurisdiction

and others. Accordingly, the officers, having unlawfully intruded into Carlson's home, conducted an unconstitutional "search" in making their visual observations.

Other factors buttress our conclusion. It is seriously to be doubted whether the full panoply of the power of the State to make a custodial arrest was indicated here. No notice of the common-place traffic tickets issued in this case was ever served upon Carlson. The officers apparently made no effort to determine whether those notices had ever been served. The warrant of arrest itself improperly states that the defendant failed to appear in response to the traffic tickets, which were never served upon him. It is the policy of the City of Helena, as testified to by the city clerk, not to issue a warrant of arrest unless the traffic offender has failed to respond to the notices. Although section 46-9-303, MCA, provides that a peace officer may accept bail in lieu of arrest when the warrant specifies the amount of the bail, that option was not followed here, although in justice to the officers, it appears to be the standard rule of the City of Helena to require such defendants to be booked in city hall where bond is posted. Another practice followed by the City of Helena, in issuing such warrants, is to provide that all such warrants may be served in the nighttime, although section 46-6-105, MCA, provides that a person cannot be arrested in his home or private dwelling place at night for a misdemeanor except upon the express direction of the magistrate endorsed upon the warrant of arrest. The officers here had no prior knowledge of any other traffic citations issued to Carlson for which he did not appear. The excuse of the officers in procuring the warrant of arrest with the fullest possible power granted by

the State was that Carlson had lied to Damon with respect to his driver's license, and therefore he might not otherwise appear. In other words, he committed the crime for which he was charged, therefore, he must be arrested. Such an argument could be made in any traffic case. The city had several other options which it did not follow: it could have requested a summons to appear, instead of a warrant of arrest, under section 46-6-301, MCA; it could have issued the notices and served them upon him; or the officers could have accepted bail on the doorstep of the Carlson home. The reasonableness of the full custodial arrest in case of traffic violations (the State contends that the obstruction of officer charge did not arise out of a traffic violation) is gravely doubtful.

What emerges from these facts is chilling. From the testimony of the two police officers and the city clerk, in the City of Helena, it is the norm that when a citizen ignores a traffic citation, a warrant of arrest is issued against him which may be served upon him at his home at any time of the day or night. When the warrant of arrest is served, it is _de rigeur_ not to accept at that time the bond that is stated on the warrant of arrest. Instead, it is standard procedure to remove the citizen bodily to city hall, where he can post his bond. If at the time of arrest, the citizen wants to put on his overcoat, the police will follow him into his home "for the safety of the police officers." In other words, a traffic violator in Helena will be accorded the same treatment as the rankest felon when his arrest is made by warrant.

The facts in this case are brought to light because it happens that Carlson may be a bad apple. We have no way of

telling how many times other citizens, guilty of an improper lane turn or rushing an amber light have been so treated. The statutes permit these procedures; we do not have to countenance them as reasonable under the facts of this case.

It is appropriate to repeat what the Alaskan court said in Anderson v. State (Alaska 1976), 555 P.2d 251, 259-60:

> "We recognize that the law of search and seizure is complex and often difficult to apply. That the permutations of human behavior sometimes carry police officers into situations which demand decisions close to the line of unconstitutional intrusions is, perhaps, an inevitability. But the rights and liberties secured by the federal and state constitutions are paramount and they will be protected . . .
>
> ". . .
>
> "While the action of the police officers here . . . may be viewed by some as only a small deviation from the constitutional standard, we feel no less moved to condemn such action here than we would were the intrusion by the police officers of an obviously greater magnitude. As Mr. Justice Bradley eloquently stated in Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886),
>
> "'. . . illegitimate and unconstitutional practices get their first footing . . . by silent approaches and slight deviations from legal modes or procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance.'
>
> "We, of course, do not condone the behavior of the appellant . . . But, we are mindful of Mr. Justice Frankfurter's observation that cases presenting issues of constitutional rights frequently involve people who have committed the most appalling of violations. He stated:
>
> "'It is a fair summary of history to say that the safeguards of liberty have frequently been forged in controversies involving not very nice people.'"

This Court has not hesitated to support intrusions by the police, either for arrest or search without a warrant, in proper cases, where exigent circumstances existed, or

where a crime was taking place at the time of entry. State v. Means (1978), 177 Mont. 193, 581 P.2d 406; State v. Bennett (1972), 158 Mont. 496, 493 P.2d 1077; State v. Hull (1971), 158 Mont. 6, 487 P.2d 1314. On the other hand, we have resisted extensions of search or seizure beyond the constitutional limitations in either federal or state constitutions under circumstances where the privacy rights of the offended party exceeded the compelling interest of the state in making the intrusion. State v. Hyem (1981), ___ Mont. ___, 630 P.2d 202, 38 St.Rep. 891; State v. Allen (1980), ___ Mont. ___, 612 P.2d 199, 37 St. Rep. 919. The high court held in United States v. Robinson (1973), 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427, 440, that the right to a full custodial search is not limited if the person is arrested for a traffic offense. We, however, refused to follow the lead of that case in State v. Jetty (1978), 176 Mont. 519, 579 P.2d 1228. There we held that where it appears that a summons would work as well as a warrant for arrest in 99 percent of the cases, placing the defendant under mandatory custodial arrest for failure to pay an overdue $1.00 parking ticket and subjecting him to a full custodial search was unreasonable. We further held that the unreasonableness was not excused because the procedure was standard on the ground that standard procedure cannot eliminate the individual's constitutional right to be free from unreasonable search and seizure. State v. Jetty, 176 Mont. 523, 579 P.2d at 1230.

The high court noted in Coolidge v. New Hampshire (1971), 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564, 583, that what the "plain view" cases had in common was that the police officer in each case had a prior justification

for an invasion into the property of the accused. The District Court noted this distinction and decided that in this case there was no prior justification for the intrusion. In analyzing this issue, the District Court noted that no search was necessary to insure the defendant would not obtain a weapon; there was no possibility that he would destroy any evidence relevant to the crimes with which he was charged; if the police officers were concerned about escape, there was no necessity to enter Carlson's house to prevent it. In addition, the District Court noted the alternatives to the invasion of defendant's home. He could have been permitted to put his pants on without supervision, he could have been taken to the station in his underwear, they could have accepted bond, or they could simply have left a summons with the defendant. In those circumstances, the District court found no prior justification or exigency for the arrival of the police officers at the point inside the house from which the observation in contention was made. The District Court then noted that "[a]rrest warrants should not be used as a key to open the door of a private residence, or converted into a search warrant absent a compelling necessity to do so."

We agree with the District Court. There was no prior justification or exigency for the entry by the police officers in this case. Their entry under the facts of this case was unreasonable, and it is that factor that converted their observation while in the house into a warrantless search, which is always presumed unreasonable. E.g., Payton v. New York (1980), 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639; Coolidge v. New Hampshire (1971), ~~423~~ 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564.

We are aware of Washington v. Chrisman (Decided January 13, 1982), ___ U.S. _____, 102 S.Ct. 812, 70 L.Ed.2d 778, in which the high court upheld the seizure of marijuana seeds and a pipe where a Washington State University policeman had entered the room to allow an arrested person to procure identification. Chrisman was the roommate of the arrested person. That case holds that when a policeman is in a place where he has a right to be, and makes a search or a seizure based upon what is in plain view, the product of the search or seizure need not be suppressed. The Supreme Court of Washington had held otherwise. 94 Wash.2d 711, 619 P.2d 971 (1980). We distinguish this case however. The District Court in this case found that the entry of the police to the defendant's home occurred through the defendant's coerced consent. We have previously held that full custodial arrest and mandatory search for a minor traffic violation is unreasonable. State v. Jetty, supra. We have, moreover, our unique state constitutional provision which defends the right of individual privacy absent a showing of compelling state interest. Art. II, § 10, 1972 Mont. Const. A compelling state interest is lacking here to overcome defendant's reasonable expectation of privacy in his home.

We attach a good deal of importance to the right of privacy guaranteed in Montana's Constitution. The State contends that we should not consider this factor because the District Court did not rely on it in suppressing the evidence. However, the issue was raised in briefs before the District Court and has been raised in briefs here. The State contends that if the right to privacy under the Montana Constitution is considered by us, it should have the right to a remand for the purpose of proving a "compelling state interest" as

required by Art. II, § 10. However, it was conceded on oral argument that no additional evidence to that already submitted to the District Court would be necessary to establish the compelling state interest sought by the State. The State argues, under this contention that a crime had been committed, arrest was necessary, the officers in this case were simply performing their duties in connection with the arrest, and the disclosure of the contraband evidence was the result of either a plain view observation made by the police officers, or a search incident to a lawful arrest.

Whether we look at the issues here from the viewpoint of the federal or the state constitution, it is clear in either event, that privacy is at the heart of the case. Stanley v. Georgia (1969), 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542, 549, emphasized the home as the situs of protected private activities and that the constitution extends special safeguards to the privacy of the home. In State v. Hyem, supra, we held under our state constitution that evidence should be suppressed where there was an unjustified intrusion into the privacy of the defendant's home.

It should be clear from the facts of this case that if we were to sustain the entry by the police officers as reasonable, there would be few instances in the service of warrants of arrest for traffic-related offenses when the officers would not gain entrance inside the home. Few persons are fully dressed and ready for the street when they answer the door in response to a knock. Inevitably the search would be held incident to the arrest, and not vice versa. The Circuit Court of Appeals for the Ninth Circuit has been careful to avoid opening up searches on the basis

of traffic-related arrests, Taglevore v. United States (1961), 291 F.2d 262; as has the Fifth Circuit, Amador-Gonzalez v. United States (1968), 391 F.2d 308.

Affirmed.

John C. Sheehy
Justice

We Concur:

Chief Justice

Gene B. Daly

Daniel J. Shea

Frank B. Morrison Jr.

Justices

Mr. Chief Justice Frank I. Haswell dissenting:

I would refuse to suppress the evidence against the defendant.

The defendant was arrested under a valid warrant. Entry into his house was justified as an incident of that arrest to prevent escape or procuring a weapon. The marijuana and drug paraphernalia were observed in plain view in defendant's front room. This evidence was later seized under a valid search warrant. There was no unreasonable search and seizure or violation of defendant's right of privacy.

The majority decision is directly contrary to the latest decision of the United States Supreme Court on the subject. Washington v. Chrisman (No. 80-1349, Decided January 13, 1982), ___ U.S. ____, 102 S.Ct. 812, 70 L.Ed.2d 778. The District Court did not have the benefit of that decision when it suppressed the evidence. The rationale of the District Court was that defendant's consent to entry into his house was subject to coercive influences invalidating defendant's waiver of the constitutional prohibition against unreasonable searches and seizures.

The _Chrisman_ court summarized the facts of that case as follows:

> "On the evening of January 21, 1978, Officer Daugherty of the Washington State University police department observed Carl Overdahl, a student at the University, leave a student dormitory carrying a half-gallon bottle of gin. Because Washington law forbids possession of alcoholic beverages by persons under 21, Wash.Rev.Code § 66.44.270, and Overdahl appeared to be under age, the officer stopped him and asked for identification. Overdahl said that his identification was in his dormitory room and asked if the officer would wait while he went to retrieve it. The officer answered that under the circumstances he would have to accompany Overdahl, to which Overdahl replied 'O.K.'

"Overdahl's room was approximately 11 by 17 feet and located on the 11th floor of the dormitory. Respondent Chrisman, Overdahl's roommate, was in the room when the officer and Overdahl entered. The officer remained in the open doorway, leaning against the doorjamb while watching Chrisman and Overdahl. He observed that Chrisman, who was in the process of placing a small box in the room's medicine cabinet, became nervous at the sight of an officer.

"Within 30 to 45 seconds after Overdahl entered the room, the officer noticed seeds and a small pipe lying on a desk 8 to 10 feet from where he was standing. From his training and experience, the officer believed the seeds were marihuana and the pipe was of a type used to smoke marihuana. He entered the room and examined the pipe and seeds, confirming that the seeds were marihuana and observing that the pipe smelled of marihuana.

"The officer informed Overdahl and Chrisman of their rights under Miranda v. Arizona, 384 U.S. 426 (1966); each acknowledged that he understood his rights and indicated that he was willing to waive them. Officer Daugherty then asked whether the students had any other drugs in the room. The respondent handed Daugherty the box he had been carrying earlier, which contained three small plastic bags filled with marihuana and $112 in cash. At that point, Officer Daugherty called by radio for a second officer; on his arrival, the two students were told that a search of the room would be necessary. The officers explained to Overdahl and Chrisman that they had an absolute right to insist that the officer first obtain a search warrant, but that they could voluntarily consent to the search. Following this explanation, which was given in considerable detail, the two students conferred in whispers for several minutes before announcing their consent; they also signed written forms consenting to the search of the room. The search yielded more marihuana and a quantity of lysergic acid diethylamide (LDS), both controlled substances." <u>Chrisman</u>, supra, slip opinion at 1-2, 102 S.Ct. at 815, 70 L.Ed.2d at 782-83.

Chrisman was charged with possession of LSD and more than 40 grams of marijuana, both felonies under Washington law. The question facing the Supreme Court on appeal was whether the evidence found by the officer should be suppressed as violating the defendant's Fourth Amendment rights.

The Supreme Court resolved the issue with this language:

"We hold, therefore, that it is not 'unreasonable' under the Fourth Amendment for a police officer, as a matter of routine, to monitor the movements of an arrested person, as his judgment dictates, following the arrest. The officer's need to ensure his own safety--as well as the integrity of the arrest--is compelling. Such surveillance is not an impermissible

invasion of the privacy or personal liberty of an individual who has been arrested." Chrisman, supra, slip opinion at 5, 102 S.Ct. at 817, 70 L.Ed.2d at 785.

The Supreme Court further found that since Overdahl had been placed under lawful arrest, the officer was authorized to accompany him to his room to obtain identification and that the officer ". . . had a right to remain literally at Overdahl's elbow at all times; nothing in the Fourth Amendment is to the contrary." Chrisman, supra, slip opinion at 4, 102 S.Ct. at 816, 70 L.Ed.2d at 785. The court further found that the officer's actions were valid as an incident to a lawful arrest.

The facts of the instant case are even more compelling. Here, unlike Chrisman, the officers had a valid arrest warrant and a valid search warrant. They had the right "as a matter of routine, to monitor the movements of [Carlson], as [their] judgment dictates, following the arrest" because of their need to ensure their own safety and the integrity of the arrest. Chrisman, supra. Consent to entry into defendant's house was unnecessary under Chrisman.

The majority's attempt to distinguish between an arrest warrant for a misdemeanor and a felony is misplaced. An arrest warrant is no less an arrest warrant because the underlying crime is classified as a misdemeanor. State v. Jetty (1978), 176 Mont. 519, 579 P.2d 1228, relied upon by the majority, involved a full custodial search in a city jail following an arrest at 3:00 a.m. for failure to pay an overdue $1.00 parking ticket. It is clearly distinguishable on the facts. Any implication therein that an arrest warrant for a misdemeanor stands on a different footing than an arrest for a felony is unwarranted. United States v. Robinson

(1973), 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427. United States Supreme Court decisions interpreting the meaning and application of provisions in the United States Constitution are controlling under the Supremacy Clause of the Constitution and take precedence over any such pronouncement of this Court, Art. III, § 2, U.S. Const.

There was no search here within the prohibition against unreasonable searches under the authorities cited by the majority. The officers didn't enter defendant's house to search for anything. They didn't conduct a search but simply observed what was in plain view. Although the officers could have seized the marijuana and drug paraphernalia in plain view at that time [Coolidge v. New Hampshire (1971), 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564], they seized nothing. Instead they applied for and received a valid search warrant and seized the evidence thereunder.

The majority further justify suppression of the evidence under the right of privacy provision in the Montana Constitution:

> "Right of privacy. The right of individual privacy is essential to the well being of a free society and shall not be infringed without the showing of a compelling state interest." Art. II, § 10, 1972 Mont. Const.

We have previously held:

> "The constitutional guarantee of individual privacy is not absolute. It must be interpreted, construed and applied in the light of other constitutional guarantees and not in isolation. The right of individual privacy must yield to a compelling state interest. Such compelling state interest exists where the state enforces its criminal laws for the benefit and protection of other fundamental rights of its citizens." State ex rel. Zander v. District Court (1979), ___ Mont. ___, 591 P.2d 656, 660, 36 St.Rep. 489, 494.

The compelling state interest here lies in the enforcement of its laws, misdemeanors as well as felonies. More importantly, it lies in providing protection for its law enforcement

officers and protecting the integrity of arrests. The right of privacy was never intended to provide a shield for criminal activity.

The same considerations underlie the right of privacy under the United States Constitution. The fact that the Helena officers obtained access to the defendant's house for a reason totally unrelated to a search for drugs does not affect the validity of the subsequent drug prosecution. The Chrisman court stated it this way:

> "This is a classic instance of incriminating evidence found in plain view when a police officer, for unrelated but entirely legitimate reasons, obtains lawful access to an individual's area of privacy. The Fourth Amendment does not prohibit seizure of evidence of criminal conduct found in these circumstances." Chrisman, supra, slip opinion at 7, 102 S.Ct. at 818, 70 L.Ed.2d at 786-87.

Likewise it doesn't prohibit the conduct of the Helena officers in this case.

Accordingly, I would permit use of the evidence in the criminal proceedings against the defendant.

Frank I. Haswell
Chief Justice

We concur in the dissent:

John Conway Harrison

[signature]

Justices