No. 93-493

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

STATE OF MONTANA,

       Plaintiff and Respondent,

v.

CHRISTOPHER DION WILLIAMS
and BRYAN EARL SMITH,

       Defendants and Appellants.

---

APPEAL FROM:   District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable William J. Speare, Judge presiding.

COUNSEL OF RECORD:

      For Appellants:

          L. Sanford Selvey, II, Yellowstone Public Defender
          Office, Billings, Montana (Williams)

          Curtis L. Bevolden, Billings, Montana (Smith)

      For Respondent:

          Hon. Joseph Mazurek, Attorney General; Patricia
          Jordan, Assistant Attorney General, Helena, Montana

          Susan P. Watters and Dale R. Mrkich, Deputy County
          Attorneys, Billings, Montana

---

Submitted on Briefs:   April 7, 1994

Decided:   June 28, 1994

Filed:

Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

Christopher Williams and Bryan Smith appeal from an order denying their motions to suppress evidence seized from a motel room. After the District Court for the Thirteenth Judicial District, Yellowstone County, ruled the evidence admissible under the "plain view" doctrine, Williams and Smith entered guilty pleas to charges of criminal possession of dangerous drugs with intent to sell. We affirm.

The issues are whether the court should have suppressed the evidence because it was obtained as a result of an illegal search of the motel room, and whether Smith has standing to object to use of the evidence.

On the afternoon of October 11, 1992, Deputy Sheriff Dennis McCave of the Yellowstone County Sheriff's Office received a phone call from a known informant concerning a black Cadillac driving around in the North Park area of Billings, Montana, in a suspicious manner. According to the informant, the car was then parked at the Rimview Inn.

McCave checked records on the Cadillac and learned it was registered to Jason Hibit-Smith, a minor on whom there was an outstanding arrest warrant for sales of dangerous drugs to an informant. McCave obtained the arrest warrant and went to the Rimview Inn with Deputy Eugene Johnson. McCave was in plain clothes and Johnson was in uniform.

The Rimview Inn motel clerk told McCave that the two men who got out of the black Cadillac were in Room 122, which was regis-

tered to Chris Williams. When the deputies knocked on the door of that room, defendant Bryan Smith, in stocking feet, opened it.

McCave asked the two men in the room for their identification. Smith replied that he was Jason Hibit-Smith, and McCave advised him that he was under arrest pursuant to the arrest warrant. (Jason Hibit-Smith was actually Smith's younger brother.) Deputy Johnson handcuffed Smith, then sat him down in a chair in the room so that they could put his shoes on. The officers observed a suitcase and a pile of clothes on the floor and a stack of money on a bed. Defendant Christopher Williams was sitting on another bed.

McCave asked Williams who he was and why he was there. Williams replied that he had just arrived from Seattle, that he knew Smith from Seattle, and that Smith had picked him up from the bus and taken him to the motel. McCave, concerned that the money on the bed might be Smith's and that it might be the fruit of drug transactions, asked whose money it was. Smith and Williams both replied that the money belonged to Williams. McCave asked how much money there was, and Williams replied, "$2,000." While McCave counted the money, Smith said there was not that much there. The stack contained a little over $1,000. McCave said he intended to seize the money until its ownership was cleared up.

Deputy Johnson, meanwhile, was writing down information from the defendants' I.D.'s. Anticipating leaving with the deputies rather than in the Cadillac, Smith asked Williams to call his uncle, and began to give a phone number. Williams asked for a pen.

3

Johnson only had one pen, which he was using. McCave said he did not have a pen and commented that motels always have pens in the room. McCave looked at the open shelf on the telephone stand and did not see a pen there. He then opened the desk drawer, immediately exposing

> three baggies that contained approximately . . . 20 to 25 little folded pieces of paper with cocaine. There was also a small baggie by itself with an eighth ounce, an eight-ball of cocaine.

McCave closed the drawer and advised Williams he was under arrest.

Based upon the discovery of suspected cocaine in the drawer, the deputies obtained warrants to seize the evidence and to search the room and the Cadillac. Both Smith and Williams were charged with possession of dangerous drugs with intent to sell. Smith was also charged with obstructing a peace officer, for misidentifying himself as his brother.

At the consolidated hearing on the motions to suppress, the court heard testimony by both deputies and by defendant Williams. Smith did not appear at the hearing, although his counsel was present.

Williams's testimony differed from that of the deputies on several matters. Williams testified that when the officers first came to the door, they stated they were delivery people. On cross-examination, however, he admitted that it "could have been" that they instead said "Sheriff's Office." Deputy McCave testified that, when he knocked on the door of Room 122, he stated, "Sheriff's Office, please open the door."

4

Williams testified that he addressed his request for a pen to Deputy Johnson and that Johnson had several pens in his shirt. Johnson testified that he only had one pen with him in the motel room.

The court heard Smith's testimony several days later. At that time, Smith testified he had missed the suppression hearing because the thermostat went out in his car. As to the events of October 11, he testified that the officers said nothing when they knocked on the door of the motel room. He stated Deputy Johnson had "a lot of pens" in his pocket. He also testified that McCave went into the bathroom and picked up some keys by the sink and that McCave "started opening drawers" after Williams asked for a pen.

The District Court ruled that the "plain view" exception to the search warrant requirement applied to this situation, because the sheriff's deputies were lawfully in the motel room and McCave inadvertently discovered the cocaine while looking for a pen for Williams. The court also ruled that Smith lacked standing to contest the legality of the search and seizure of the cocaine in the motel room, because he had no legitimate expectation of privacy in the room.

Should the court have suppressed the evidence because it was obtained as a result of an illegal search of the motel room, and does Smith have standing to object to use of the evidence?

We first address Smith's standing to raise Fourth Amendment objections to the opening of the drawer. In Minnesota v. Olson

(1990), 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85, the Court held that an overnight guest in an apartment had a legitimate expectation of privacy in the home. Smith argues that the Olson holding extends to him, as a guest in Williams's motel room.

Status as an overnight guest was critical in Olson:

> From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside. We are at our most vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings. It is for this reason that, although we may spend all day in public places, when we cannot sleep in our own home we seek out another private place to sleep, whether it be a hotel room, or the home of a friend.

Olson, 495 U.S. at 99. In the present case, Smith does not claim that he intended to stay or had stayed in Williams's room overnight. He denied even taking a nap, or intending to do so, in the room. He testified that he was just "waiting for Chris to get out of the shower." We conclude that Olson is not controlling.

The idea that anyone legitimately on a premises may raise Fourth Amendment objections to a search of the premises has been rejected as "too broad a gauge for measurement of Fourth Amendment rights." Rakas v. Illinois (1978), 439 U.S. 128, 142, 99 S.Ct. 421, 429, 58 L.Ed.2d 387, 400. The protections offered by the Fourth Amendment may more properly be said to extend to anyone who has a legitimate expectation of privacy in the place. Rakas, 439 U.S. at 143. This requires more than a subjective expectation of not being discovered.

> Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by

6

reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.

Rakas, 439 U.S. at 144, n. 12.

Smith does not articulate any reason, other than his mere presence in the motel room, why he had a legitimate expectation of privacy in the desk drawer in that room. In the absence of such a showing, we hold that the District Court did not err in ruling that Smith is not entitled to raise Fourth Amendment objections to Deputy McCave opening the drawer.

On the other hand, Williams, as the registered guest in the room, undisputedly has standing to object to McCave looking in the desk drawer. See, e.g., State v. Ottwell (1989), 239 Mont. 150, 779 P.2d 500. We therefore proceed with our analysis of the "plain view" doctrine.

The Fourth Amendment prohibition against warrantless searches and seizures is not violated when the circumstances fall within the "plain view" doctrine. The elements of the "plain view" doctrine were first defined in Coolidge v. New Hampshire (1971), 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564, 583, as (1) the law enforcement officer had a prior justification for an intrusion; and (2) in the course of the intrusion the officer inadvertently came across a piece of evidence. Prior justification for the intrusion may consist of "a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused." Coolidge, 403 U.S. at 466. Exigent circumstances are

7

necessary to justify immediate seizure of evidence in plain view, but that requirement does not apply here because the deputies obtained a warrant before seizing the cocaine.

The applicability of the "plain view" doctrine to this case depends upon factual determinations of (1) whether the deputies were lawfully in the motel room (prior justification for the intrusion), and (2) whether McCave inadvertently came across the cocaine in the drawer. It is within the province of the district court to find the facts based upon the testimony at a suppression hearing, and this Court will not overturn such findings unless they are clearly erroneous. State v. Cope (1991), 250 Mont. 387, 396, 819 P.2d 1280, 1286, modified, State v. Bower (1992), 254 Mont. 1, 833 P.2d 1106. The credibility of the witnesses and the weight to be given their testimony are matters within the discretion of the district court.

Williams argues that the entry by the deputies into the motel room after Smith's arrest was an intrusion into a protected area not within Smith's immediate control. He cites State v. Kao (1985), 215 Mont. 277, 697 P.2d 903, as authority that exigent circumstances, probable cause, or consent was necessary before the deputies could lawfully enter the motel room.

The testimony conflicted on whether Smith's arrest after he misidentified himself as his brother occurred inside or immediately outside the motel room. But regardless of where the arrest occurred, it is undisputed that the deputies went into the room

8

with Smith to get his shoes and his identification. There were no such circumstances in Kao.

It is not unreasonable under the Fourth Amendment for a police officer, as a matter of routine, to monitor the movements of an arrested person. Washington v. Chrisman (1982), 455 U.S. 1, 102 S.Ct. 812, 70 L.Ed.2d 778. In Washington, the facts were very similar to those here--the arrestee had to return to a dorm room to retrieve his identification. The Court held that the arresting officer rightfully followed him and observed marijuana in plain view in the dorm room. Similarly, we conclude that the deputies in the present case were lawfully in the room for purposes of allowing Smith to retrieve his shoes and his identification.

Williams offers no factual support for his claim that looking for a pen was a "pretext" for opening the desk drawer. McCave testified that he and Johnson were nearly ready to leave the room with Smith when Williams made the request for a pen. Williams admits that he asked for a pen to write down the telephone number Smith was giving him. McCave's testimony that he did not have a pen was unrefuted. It was within the discretion of the District Court to determine which was more credible, Johnson's testimony that he had only one pen which he was already using, or the testimony of Smith and Williams that Johnson had more than one pen. Further, McCave testified without contradiction that he opened the drawer only to accommodate Williams's request for a pen.

Smith also made unsupported comments that Deputy McCave may have opened more than one drawer, hinting at a ransacking of the

9

motel room. Other than Smith's somewhat equivocal comments, there is no evidence of this. McCave stated that, in trying to locate a pen for Williams, he looked on the open shelf under the phone and then opened the desk drawer containing the cocaine. We conclude the District Court did not abuse its discretion in ruling that discovery of the cocaine was inadvertent.

The dissent cites as Montana authority for its position State v. Carlson (1982), 198 Mont. 113, 644 P.2d 498. The dissent fails to acknowledge that this Court has specifically limited its reasoning in Carlson to cases involving traffic-related misdemeanor offenses. See State v. Wood (1983), 205 Mont. 141, 143, 666 P.2d 753, 754.

The officers went to the Rimview Inn to serve a felony arrest warrant for sales of dangerous drugs on Jason Hibit-Smith. The officers were not trying to serve an arrest warrant for a minor traffic offense as in Carlson. In Wood, the defendant was charged with issuing a bad check, a felony. This Court specifically and unequivocally stated that Carlson is limited to arrests for traffic-related misdemeanors:

> The Court, in Carlson, clearly limited its ruling to traffic-related misdemeanors. The interests of society in the administration of justice is [sic] greater here than in Carlson since a felony is involved. This is a sufficient compelling interest to justify a full custodial arrest.
>
> . . .
>
> . . . Carlson is limited to traffic-related misdemeanors. In Carlson this Court addressed the issue whether a full custodial arrest was proper for misdemeanor traffic offenses. . . .

10

. . .

The rationale for our holding was based on the misdemeanor traffic offenses.

<u>Wood</u>, 666 P.2d at 754.

We hold that the District Court did not err in denying the motion to suppress. Affirmed.


_____
                                 Chief Justice

We concur:

_____

_____

_____

_____
Justices

11

Justice Terry N. Trieweiler dissenting.

I dissent from the majority opinion which, in order to sustain defendants' convictions, ignores Montana statutory law and prior case law, and seriously erodes the right of Montanans to be free from unreasonable warrantless searches of areas where they have a reasonable expectation of privacy.

## BACKGROUND

Although the evidence presented to the District Court was in conflict, I support the principle that resolving those conflicts is the province of the District Court, and therefore, the following facts are derived from the testimony of Officer Dennis McCave, and are those which are most favorable to the position of the State.

After McCave and Deputy Sheriff Eugene Johnson arrived at the motel room which was registered to Chris Williams, and in which both Williams and Jason Smith were occupants, they entered without invitation and without permission. Upon gaining entry, McCave observed all that was in sight. He observed a suitcase, clothing, money, and a few personal items, but nothing that was illegal.

Smith was placed under arrest and handcuffed with his arms behind him. He was then seated on a chair near the door while Williams was questioned regarding his identity and his reasons for being in Billings.

McCave and Johnson did not have a search warrant. Neither were they given permission to enter the room. At no time did either defendant act in a threatening manner, and McCave testified he had no probable cause to think there was contraband or fruits of

12

a crime located in the drawers of the motel room. Johnson also testified that the officers had no concern for their safety at any time during the arrest or while present in the defendants' room.

It is clear from the testimony of all the witnesses that there were no drugs in "plain view" when McCave and Johnson entered the defendants' room. The drawer in which the drugs were ultimately found was completely closed, and neither McCave nor Johnson were given permission to open the drawer. McCave opened one, and possibly several, drawers in response to Williams' request for a pen. The fact that the majority could construe such a request as permission to go through the drawers in the defendants' room, or even worse, conclude that once the drawers were opened without permission, the drugs were in "plain view" is nothing short of preposterous. Any court which would misconstrue the facts to this extent in order to arrive at a conclusion that the Constitution was not violated has no respect for the Fourth Amendment nor Article II, Section 11, of the Montana Constitution.

In arriving at its conclusion that the District Court was correct in denying defendants' motions to suppress evidence obtained in their motel room, the majority relies on two incorrect conclusions of law. They are addressed separately in the following part of this opinion:

## STANDING

First of all, it is clear that the Fourth Amendment protection against unreasonable searches and seizures applies to a guest in a hotel room, as well as the resident of a home. In *Stoner v. California*

13

(1964), 376 U.S. 483, 490, 84 S. Ct. 889, 893, 11 L. Ed. 2d 856, 861, the U.S. Supreme Court held that:

> No less than a tenant of a house, or the occupant of a room in a boarding house, *McDonald v. United States*, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 [1948,] a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures. *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 [1948].

Furthermore, whether the motel room was registered in Williams' name or Smith's name is irrelevant. The United States Supreme Court has repeatedly made clear that the right to be free from unreasonable warrantless searches does not depend on an occupant's proprietary interest in the area that is to be searched. In *Rakas v. Illinois* (1978), 439 U.S. 128, 143, 99 S. Ct. 421, 430, 58 L. Ed. 2d 387, 401-02, the Supreme Court reaffirmed that:

> *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), provides guidance in defining the scope of the interest protected by the Fourth Amendment. In the course of repudiating the doctrine derived from *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), and *Goldman v. United States*, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942), that if police officers had not been guilty of a common-law trespass they were not prohibited by the Fourth Amendment from eavesdropping, the Court in *Katz* held that capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place. 389 U.S. at 353; see *United States v. Chadwick*, 433 U.S. 1, 7, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *United States v. White*, 401 U.S. 745, 752, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971). Viewed in this manner, the holding in *Jones* can best be explained by the fact that Jones had a legitimate expectation of privacy in the premises he was using and therefore could claim the protection of the Fourth Amendment with respect to a governmental invasion of those premises, even though his "interest" in those premises might not have been a recognized property

14

interest at common law. See *Jones v. United States*, 362 U.S. at 261.

For the reasons set forth in *Katz* and *Rakas*, the Supreme Court recently held in *Minnesota v. Olson* (1990), 495 U.S. 91, 110 S. Ct. 1684, 109 L. Ed. 2d 85, that an overnight guest in another's home had a sufficient expectation of privacy in that home to invoke the Fourth Amendment protection against unreasonable searches and seizures. In language relevant to this case, the Court stated that:

> It is for this reason that, although we may spend all day in public places, when we cannot sleep in our own home we seek out another private place to sleep, whether it be a hotel room, or the home of a friend. Society expects at least as much privacy in these places as in a telephone booth--"a temporarily private place whose momentary occupants' expectations of freedom from intrusion are recognized as reasonable." *Katz*, 389 U.S. at 361 (Harlan, J., concurring).

*Olson*, 495 U.S. at 99.

The only difference between the situation of the accused in *Olson* and Smith in this case, was that Smith was not an "overnight" guest. However, he was still a guest in the private, even though temporary, quarters of another, and as such had, by our society's standards, a reasonable expectation of privacy and freedom from governmental intrusion while present at that location.

As pointed out in the *Olson* decision, Smith, in this case, had at least as much expectation of privacy while behind the closed door of a companion's room as *Katz* had while talking on the telephone in a glass telephone booth.

15

The majority concludes that the critical distinction between this case and *Olson* is that the defendant in that case was an "overnight" guest, rather than a day time guest. However, I can think of no rational basis for concluding that a person's expectation of privacy depends on the length of time during which he is a guest in another's home, or the time of day during which he is present in another's home or motel room. The majority opinion simply substitutes an arbitrary and irrelevant criterion for the real test from the *Rakas* decision which is whether an expectation of privacy under these circumstances is reasonable in light of "understandings that are recognized and permitted by society." *Rakas*, 439 U.S. at 144 n.12.

For these reasons, I dissent from that part of the majority opinion which concludes that Bryan Earl Smith did not have standing to move to suppress the evidence seized from Room 122 of the Rimview Inn in Billings on October 11, 1992.

## PLAIN VIEW DOCTRINE

McCave and Johnson had no search warrant which authorized them to search the room occupied by Williams and Smith. They did have a warrant for Smith's arrest, even though they did not bring it with them to the room when he was arrested. Section 46-5-102, MCA, sets forth the circumstances under which a search will be permitted pursuant to a lawful arrest. That section provides that:

> When a lawful arrest is effected, a peace officer may reasonably search the person arrested and the area within such person's immediate presence for the purpose of:
> (1)   protecting the officer from attack;
> (2)   preventing the person from escaping;

16

(3) discovering and seizing the fruits of the crime; or

(4) discovering and seizing any persons, instruments, articles, or things which have been used in the commission of or which may constitute evidence of the offense.

The first circumstance does not apply because both officers testified that they were not concerned about attack from either Williams or Smith. Smith, in fact, had already been arrested, handcuffed, and was seated on a chair near the door. Obviously, the second circumstance does not apply because going through the drawers in the room had nothing to do with preventing Smith's escape. Finally, neither the third nor fourth circumstances apply because the crime for which Smith had been arrested involved a previous drug transaction and no one testified that there was any reason to suspect that evidence of that crime was present in the motel room when McCave started opening drawers.

The majority incredibly concludes that even though these two law officers had no search warrant nor any permission to search the defendants' room, and even though the search was not pursuant to arrest as provided for by statute, the officers had authority to search the area where drugs were found under the "plain view" doctrine. The majority's conclusion is erroneous for several reasons. First of all, the conclusion that the officers were in the defendants' room legally in the first place is premised on the U.S. Supreme Court's decision in *Washington v. Chrisman* (1982), 455 U.S. 1, 102 S. Ct. 812, 70 L. Ed. 2d 778. The majority opinion fails to note that we declined to follow *Chrisman* under similar circumstances in *State v. Carlson* (1982), 198 Mont. 113, 644 P.2d 498. Furthermore,

17

even if the officers were legitimately in the motel room, the drugs ultimately discovered were not in "plain view" in that room and were not discovered until one of the officers started going through drawers which they had no prior permission to open. The fact that one of the occupants asked one of the officers to borrow <u>his</u> pen was not a request to rummage through the motel room drawers looking for another pen, and did not satisfy the requirement from *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 467, 91 S. Ct. 2022, 2038, 29 L. Ed. 2d 564, 583, that there be prior justification for intrusion in the area where the evidence is found. Presence in the defendants' room did not place the contents of the defendants' drawers in "plain view" for purposes of establishing an exception to the requirement that searches be conducted pursuant to a search warrant.

In *Carlson*, Helena City Police Officers came to the defendant's home to serve misdemeanor arrest warrants. The defendant appeared at the door, where he was advised that he was under arrest. However, he, like Smith in this case, requested the opportunity to complete dressing, and therefore, the officers accompanied him into his home while he did so. They were never told that they could not enter, and were never given specific permission to enter.

Once inside the home, the officers in *Carlson* observed drugs and drug paraphernalia which was in plain view on a coffee table in the living room. They did not seize the evidence but, like the officers in this case, used the observation to obtain a warrant with which they later returned and searched the defendant's home.

18

The defendant moved to suppress the evidence seized in his home, and the State opposed the motion, based on the "plain view" doctrine.

After acknowledging the "plain view" doctrine, this Court held that:

> If therefore, the officers in this case were lawfully in Carlson's front room when they made the visual observations, a "search" within the constitutional sense did not occur; on the other hand, if their presence in the front room was not consented to, as the District Court determined, the visual examination does constitute a "search" in the constitutional sense.
>
> The validity of the officers' entry into Carlson's front room is the fulcrum therefore on which this case turns.

*Carlson*, 644 P.2d at 501.

This Court concluded that under these circumstances valid consent had not been given because:

> In order to show that voluntary consent to search was obtained, the State must show that the consent was unequivocal, specific, intelligently given and uncontaminated by duress or coercion. This Court has held that there is a heavy burden of proof required to show that there was consent to a search. *State v. LaFlamme* (1976), 177 Mont. 202, 204, 551 P.2d 1011, 1012. Equivocal conduct alone is insufficient as a basis for inference of consent to a search, which consent is a waiver of a constitutional right. [Citations omitted].

*Carlson*, 644 P.2d at 502.

Based on this standard, there can hardly be any intellectually honest argument that either Williams or Smith consented to have their drawers searched in their motel room by requesting a pen from Officer Johnson.

19

The majority bases its conclusion on *Coolidge* and *Chrisman*. However, both cases were considered in *Carlson* and rejected as a basis for entrance into the defendant's home. Regarding *Coolidge*, we stated that:

> The high court noted in *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564, 583, that what the "plain view" cases had in common was that the police officer in each case had a prior justification for an invasion into the property of the accused. The District Court noted this distinction and decided that in this case there was no prior justification for the intrusion. . . .
>
> We agree with the District Court. There was no prior justification or exigency for the entry by the police officers in this case. Their entry under the facts of this case was unreasonable, and it is that factor that converted their observation while in the house into a warrantless search, which is always presumed unreasonable. E.g., *Payton v. New York* (1980), 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639; *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564.

*Carlson*, 644 P.2d at 504.

We also specifically addressed the applicability of *Chrisman* to these circumstances. We stated that:

> We are aware of *Washington v. Chrisman* (1982), [455] U.S. [1], 102 S.Ct. 812, 70 L.Ed.2d 778, in which the high court upheld the seizure of marijuana seeds and a pipe where a Washington State University policeman had entered the room to allow an arrested person to procure identification. Chrisman was the roommate of the arrested person. . . . We distinguish this case however. The District Court in this case found that the entry of the police to the defendant's home occurred through the defendant's coerced consent. We have previously held that full custodial arrest and mandatory search for a minor traffic violation is unreasonable. *State v. Jetty* [(1978), 176 Mont. 519, 579 P.2d 1228]. We have, moreover, our unique state constitutional provision which defends the right of individual privacy absent a showing of compelling state interest. Art. II, § 10, 1972 Mont. Const. A compelling state interest is lacking here to

20

> overcome defendant's reasonable expectation of privacy in his home.

*Carlson*, 644 P.2d at 504.

The facts in this case are even more offensive to the right to be free from unreasonable searches than the facts in *Carlson*. In this case, not only did the officers enter the defendants' motel room without permission and without a warrant, but the evidence ultimately seized was not even in "plain view" once they arrived in the motel room. It was only discovered after the defendants' privacy was further invaded by opening drawers in that room without their permission. The fact that one of the defendants asked for a pen did not justify going through the defendants' drawers, it was merely a pretext for a search which was constitutionally prohibited.

The majority attempts to distinguish this case from *Carlson* based on the fact that these defendants were arrested for an alleged felony and the defendant in *Carlson* was arrested for an alleged misdemeanor. According to the majority, *Carlson* was overruled by our decision in *State v. Wood* (1983), 205 Mont. 141, 666 P.2d 753. However, the majority opinion misconstrues the basis for our decision in *Carlson* and exaggerates the extent to which it was modified by *Wood*.

In *Carlson*, we discussed two issues: (1) whether the defendant had freely consented to the entry of police into his home or

21

whether entry was subtly coerced; and (2) whether custodial arrest is ever appropriate for a misdemeanor.

In *Wood*, we merely concluded that the prohibition against custodial arrest for a misdemeanor did not apply to felonies. In that case, there was no discussion about the circumstances under which an arrest warrant could serve as a pretext for entering someone's home or private quarters. Neither did we reconsider our prior determination that the unique guarantee of privacy in the State of Montana required a greater showing than was required in *Chrisman* for entry into a person's home or room. *Wood* simply has no applicability to this case.

The majority's analysis ends with its conclusion that the arresting officers lawfully entered the defendants' room, and then as an afterthought, concludes that the defendants did not prove that "looking for a pen was a 'pretext' for opening the desk drawer." However, the majority has it backwards. The defendants did not have to prove anything. Since the State did not have a warrant which authorized it to go through the defendants' drawers, it had to prove that its officers had permission, or some other justification for doing so, and there was a total failure of such proof. The majority does not even bother to address this issue, but simply concludes that it was sufficient that one of the defendants asked one of the officers (not the one who conducted the search) for a pen.

We have come a long way from the days when the State had the burden to show that "consent was unequivocal, and intelligently

22

given." Unfortunately, this progress has been at the expense of the Constitution and sound judicial reasoning.

The majority's willingness to distort the law to justify a search under these circumstances may, in the short term, punish a couple more small-time drug dealers, but the benefit does not justify the long-term detriment that has been done to the right of all citizens to be free from unreasonable and warrantless government searches. This decision is just one more step toward the erosion of the right to privacy guaranteed to all Montanans and one with which I cannot concur.

For these reasons, I dissent from the majority's conclusion that the evidence seized from the motel room occupied by defendants Williams and Smith was acceptable under the "plain view" doctrine. I would reverse the order of the District Court.

_____
Justice

Justice William E. Hunt, Sr., joins in the foregoing dissent.

_____
Justice

June 29, 1994

## CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

L. Sanford Selvey, II
Yellowstone County Public Defenders
2720 3rd Avenue No., Suite #200
Billings, MT 59101

Curtis L. Bevolden
Attorney at Law
P. O. Box 1381
Billings, MT 59103-1381

Susan P. Watters
Deputy County Attorney
P. O. Box 35025
Billings, MT 59107

Dale R. Mrkich
Deputy County Attorney
P. O. Box 35025
Billings, MT 59107

Hon. Joseph Mazurek, Attorney General
Patricia Jordan, Assistant
Justice Building
Helena, MT 59620

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _Gallagher_
    Deputy