No. 05-363

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 305

STATE OF MONTANA,

        Plaintiff and Respondent,

   v.

 KRISTI ANNE MOODY,

        Defendant and Appellant.

APPEAL FROM:    The District Court of the Thirteenth Judicial District,
In and For the County Yellowstone, Cause No. DC 2002-478,
Honorable Ingrid G. Gustafson, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

           Penelope S. Strong, Chief Public Defender; Tanya Dvarishkis,
           Deputy Public Defender, Billings, Montana

        For Respondent:

           Honorable Mike McGrath, Attorney General; Joslyn M. Hunt and
           Mark W. Mattioli, Assistant Attorneys General; Helena, Montana

           Diana Koch, Chief Legal Counsel, Department of Corrections,
           Helena, Montana

           Dennis Paxinos, County Attorney, Billings, Montana

                    Submitted on Briefs:  August 11, 2006
                                  Decided:  November 28, 2006

Filed:

_____
                         Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 Montana's Thirteenth Judicial District Court, Yellowstone County, sentenced Kristin Anne Moody to a two-year deferred sentence based on three separate charges. Prior to sentencing, Moody filed objections to several probation conditions recommended in the pre-sentence investigation (PSI) report. The District Court nonetheless imposed most of the proposed conditions. Moody now appeals. We affirm on the following issues:

¶2 1. Does requiring a probationer to keep her home open and available for the probation officer to visit at all times violate the Montana Constitution?

¶3 2. Did the District Court properly impose a travel restriction as a condition of Moody's probation?

## BACKGROUND

¶4 In responding to a report on May 7, 2004, Officers Wells and Ostermiller of the Laurel Police Department came across a gray van that had reached a complete stop in the middle of an intersection. Officers Wells and Ostermiller approached the van and found Moody, who appeared to be asleep at the wheel. The officers removed Moody from the van and verified that she did not need medical attention. Smelling of alcohol and unsteady on her feet, Moody swore at the officers and refused to perform any field sobriety tests or provide a breath alcohol sample. Moody could not find the registration for the vehicle and stated that she did not have any car insurance. The officers arrested Moody, placing her in handcuffs. When they tried to get Moody into the backseat of the patrol vehicle, Moody kicked at Officer Wells, striking him in the face with such force

2

that she left a visible boot imprint. Eventually the officers restrained Moody and transported her to the Yellowstone County Detention Facility.

¶5 The State charged Moody by information with Count I, assault on a police officer, a felony in violation of § 45-5-210(1)(a), MCA; Count II, driving under the influence of alcohol or drugs, a misdemeanor in violation of § 61-8-401, MCA; and Count III, driving without required motor vehicle insurance, a misdemeanor in violation of § 61-6-302, MCA.

¶6 Moody pled guilty to all three counts pursuant to a plea agreement. Prior to sentencing, Probation Officer Barry Ivanoff prepared the PSI with recommendations for the conditions of Moody's probation. Moody filed an objection to several of the proposed conditions, including 2 and 3, which read as follows:

> 2. The Defendant will not change [her] place of residence without first obtaining permission from [her] Probation/Parole Officer. The residence must be approved by [her] Probation & Parole Officer. *The Defendant will make the home open and available for the Probation & Parole Officer to visit as required per policy.* The Defendant will not own dangerous/vicious animals such as guard dogs, use perimeter security doors, or refuse to open the door of the residence when requested. [Emphasis added.]

> 3. The Defendant shall not leave [her] assigned district without first obtaining written permission from [her] Probation & Parole Officer.

¶7 Moody objected to the requirement that she make her home "open and available" to her probation officer on the grounds that this condition obviated the reasonable cause requirement for searches of probationers' homes, and thus violated her constitutional rights of privacy and protection from unreasonable search and seizure. Moody also objected to the travel restriction, arguing that it inhibited her constitutional rights to travel

3

and work and her freedom of association; she also argued that the restriction was not sufficiently related to her rehabilitative needs and did not protect society.

¶8 At the sentencing hearing, Moody called Officer Ivanoff to testify regarding the probation conditions he recommended. After Moody and the State argued their respective positions, the District Court issued the sentence, imposing both the second and third probation conditions. Moody appeals.

## STANDARD OF REVIEW

¶9 We review a District Court's criminal sentence for legality only. *State v. Eaton*, 2004 MT 283, ¶ 11, 323 Mont. 287, ¶ 11, 99 P.3d 661, ¶ 11.

## DISCUSSION

¶10 **1. Does requiring a probationer to keep her home open and available for the probation officer to visit at all times violate the Montana Constitution?**

¶11 Moody argues that Condition 2 of her probation, which requires that she keep her "home open and available for the Probation & Parole Officer to visit," violates the *reasonable cause* standard applied by this Court to searches of probationers' residences, as well as Admin. R. M. 20.7.1101(7), governing conditions on probation. Because we conclude that a "home visit" to a probationer's residence does not qualify as a "search," we affirm the District Court's ruling.

¶12 The search of a person may be conducted pursuant to a valid search warrant or in accordance with a judicially recognized exception. Section 46-5-101, MCA. In Montana, a probation officer may search a probationer's residence without a warrant so long as the officer has reasonable cause for the search. *See State v. Roper*, 2001 MT 96,

4

¶ 12, 305 Mont. 212, ¶ 12, 26 P.3d 741, ¶ 12; *State v. Beaudry*, 282 Mont. 225, 228, 937 P.2d 459, 460-61 (1997); *State v. Burchett*, 277 Mont. 192, 195, 921 P.2d 854, 856 (1996); *State v. Boston*, 269 Mont. 300, 305, 889 P.2d 814, 817 (1995); and *State v. Burke*, 235 Mont. 165, 169, 766 P.2d 254, 256-57 (1988). "The 'reasonable cause' standard is substantially less than the probable cause standard required by the Fourth Amendment because of the probationer's diminished expectation of privacy . . . ." *Burchett*, 277 Mont. at 195-96, 921 P.2d at 856 (citing *Burke*, 235 Mont. at 169, 766 P.2d at 256-57, and *Griffin v. Wisconsin*, 483 U.S. 868, 107 S. Ct. 3164 (1987)). Admin. R. M. 20.7.1101(7) further underscores our precedent by permitting a warrantless search of a probationer's or parolee's person, vehicle or residence only "upon reasonable cause."

¶13     The State points out that the United States Supreme Court has recently held that a suspicionless search, conducted pursuant to a California statute requiring parolees to agree in writing to be subject to searches with or without cause was constitutional. *Samson v. California*, ___ U.S. ___, 126 S. Ct. 2193 (2006). The search in *Samson* was conducted by a police officer rather than a probation officer so the court applied an ordinary Fourth Amendment analysis, rather than engaging in a *Griffin* "special needs" analysis applicable to probationers. *Griffin*, 483 U.S. at 873, 107 S. Ct. at 3168. The State, relying on *Samson*, contends that if there is no "reasonable cause" requirement for a search of a parolee, there should be no such requirement for a less intrusive "home visit," which is not a search.

¶14     Moody contends that *Samson* is distinguishable since it involved search of a parolee on the street as opposed to a probationer in her home; further, since probationers

5

such as Moody are much less of a threat than parolees, they have a higher expectation of privacy and freedom from unreasonable searches under the Montana Constitution.

¶15 The initial inquiry then is whether a "home visit" constitutes a "search" under Article II, Section 11, Montana Constitution.

¶16 A *home visit*—where the probation officer stops by the probationer's home to determine whether the individual is abiding by the conditions of his or her probation—operates as an important check on a probationer's rehabilitation efforts. As the Department of Corrections states in its *Probation and Parole Bureau Standard Operating Procedures*, home visits are conducted to address the following:

- verify offender's home address;

- observe and determine lifestyle factors;

- meet significant others, family members, other residents of home;

- observe residence for contraband, weapons, illegal or dangerous objects (if visual inspection of the residence provides reasonable suspicion that the offender has items banned by probation rules or court order, conduct a search per P&P 60-4, Searches of Offender's Person, Vehicle, Residence Confiscation of Offender's Property);

- observe residence for non-essential items such [as] VCR/ Cable/Computer-Internet capabilities if offender's financial obligations to victim, court and bureau are not being met;

- observe residence for cable/computer/Internet capabilities if offender is a sex offender and/or has restrictions;

- conduct visual inspection of home;
- observe neighborhood for potential public safety issues such as high crime area (gang graffiti), schools/parks (sex offenders) or other vulnerable neighbors;

- assess home environment for officer safety (may draft a floor plan of home); and

- require offender to submit to breathalyzer/urinalysis screening for use of alcohol and/or drugs.

Chapter 60, "Sign-Up Procedure/Supervision Standards."

¶17 As the above list indicates, probationary restrictions are meant to facilitate rehabilitation and ensure that the community is not harmed by the probationer's conditional liberty status. *Burke*, 235 Mont. at 169, 766 P.2d at 256. The probation officer is charged with not only enforcing conditions of supervision, but also discerning any deception by the probationer. *United States v. Reyes*, 283 F.3d 446, 458 (2d Cir. 2002).

¶18 In determining whether a "search" has occurred, we look at three factors: (1) whether the person has an actual expectation of privacy; (2) whether society is willing to recognize that expectation as objectively reasonable; and (3) the nature of the State's intrusion. *State v. Elison*, 2000 MT 288, ¶ 48, 302 Mont. 228, ¶ 48, 14 P.3d 456, ¶ 48.

¶19 "Probation is an act of grace by a sentencing court, intended to give the offender a chance to rehabilitate outside the prison setting." *State v. Boulton*, 2006 MT 170, ¶ 15, 332 Mont. 538, ¶ 15, 140 P.3d 482, ¶ 15. Although less restrictive than prison, probation is nonetheless a form of punishment. Although a probationer is restored to "full rights" upon successful completion of state supervision, Article II, Section 28(2), Montana Constitution, a probationer who is still subject to supervision has a diminished expectation of privacy. *Burchett*, 277 Mont. at 195-96, 921 P.2d at 856. Accordingly, probationers do not enjoy the absolute liberty and heightened expectations of privacy

7

afforded every Montana citizen; rather, they are subject to conditional liberty properly dependent upon special restrictions. *Beaudry*, 282 Mont. at 229, 937 P.2d at 461. Home visits are one commonly imposed condition of probation. We conclude that a convicted felon who is granted probation on a clearly expressed condition, of which she is "unambiguously" aware, that she make her home open and available for the probation officer to visit pursuant to state policy does not have an actual expectation of privacy that would preclude home visits. *United States v. Knights*, 534 U.S. 112, 119, 122 S. Ct. 587, 591-92 (2001). Since there is no actual expectation of privacy, there is no search.

¶20 Even assuming *arguendo* that a probationer had an actual expectation that there would be no home visits during the period of supervision, home visits serve to ensure that the supervised felon is abiding by the conditions of her probation, thus addressing the problem of recidivism. As the United States Supreme Court has noted, "'[t]he very assumption of the institution of probation' is that the probationer 'is more likely than the ordinary citizen to violate the law.' The recidivism rate of probationers is significantly higher than the general crime rate." *Knights*, 534 U.S. at 120, 122 S. Ct. at 592 (citing studies) (quoting *Griffin*, 483 U.S. at 880, 107 S. Ct. at 3172). Studies suggest that "more intensive supervision can reduce recidivism . . . ." *Griffin*, 483 U.S. at 875, 107 S. Ct. at 3168. Accordingly, society would not recognize that expectation as objectively reasonable.

¶21 As to the nature of the state's intrusion, home visits are a commonly imposed condition of probation which allow the probation officer to determine whether the

8

individual is abiding by the conditions of probation and thus serve to protect the safety and welfare of society.

¶22    Other courts addressing the issue of whether a home visit constitutes a search have concluded that, although such visits can evolve into a search, the initial visit is not a search. *See United States v. Workman*, 585 F.2d 1205, 1208 (4th Cir. 1978) (superseded on other grounds); *Latta v. Fitzharris*, 521 F.2d 246 (9th Cir. 1975), *cert. denied* 423 U.S. 897 (1975). The Second Circuit Court of Appeals in *Reyes*, 283 F.3d at 460-62, upheld a plain view discovery of contraband in the context of a home visit of a probationer pursuant to a probation condition permitting home visits at any time. The appeals court reasoned that such visits are a necessary incident to probationary supervision and concluded:

> Accordingly, consonant with the Supreme Court's holding in *Knights* that "no more than reasonable suspicion" was required to search a state probationer's home when that search was authorized by a condition of probation, we hold that the probable cause requirements of the Fourth Amendment do not apply to a federal probation officer conducting a home visit—a far less invasive form of supervision than a search—pursuant to a convicted offender's conditions of supervised release. Furthermore, we hold that because home visits "at any time" are conducted pursuant to a *court-imposed condition* of federal supervised release of which the supervisee is aware, and because a home visit is far less intrusive than a *probation search*, probation officers conducting a *home visit* are not subject to the reasonable suspicion standard applicable to *probation searches* under *Knights*.

*Reyes,* 283 F.3d at 462.

¶23    A probationer has no reasonable expectation of privacy that would preclude home visits from taking place. *See also State v. Guzman*, 990 P.2d 370 (Or. App. 1999); *Grubbs v. State*, 373 So.2d 905, 908-10 (Fla. 1979).

9

¶24 Since a home visit is not a search, a probation officer may not open drawers, cabinets, closets or the like; nor may the officer rummage through the probationer's belongings. While a home visit has the potential to turn into a search pursuant to an officer's plain view observations, it must remain within the parameters of a home visit unless or until there is reasonable cause to engage in a search.

¶25 The dissent argues that the Court has gone astray in its analysis by relying on the fact that Moody was granted probation on the condition that she submit to home visits. In the dissent's view, this condition of probation "plays no meaningful" role in determining whether the intrusion constitutes a search. Secondly, assuming that the Court has adopted a "consent" rationale for circumventing what would otherwise be a search, the dissent proceeds to argue lack of meaningful consent.

¶26 The "condition of probation" focus, however, is separate from a "consent" analysis. The United States Supreme Court made this abundantly clear in *Knights* where, although the Court specifically declined to address the issue of "consent," it nonetheless noted that the probation order clearly set out the probation search requirement; that Knights was "unambiguously" aware of the condition and that his acceptance of a clear and unambiguous condition significantly diminished his reasonable expectation of privacy. In *Knights*, the probationary search which the Court upheld was predicated on both the probation condition and reasonable suspicion. In 2006, the Court in *Samson* addressed the question left unresolved in *Knights*—whether the search would have been reasonable under the Fourth Amendment had it been *solely* predicated upon the condition of probation. *Samson,* 126 S. Ct. at 2198 (citing *Knights,* 534 U.S. 120 n. 6, 122 S. Ct. at

592 n. 6). Clearly, under both *Samson* and *Knights*, the condition of probation (or parole) is not only meaningful but, in the words of the Court, "salient" (*Knights*, 534 U.S. at 118, 122 S. Ct. at 491; *Samson*, 126 S. Ct. at 2199) and can be dispositive of the issue of whether a probationer has an expectation of privacy that society would recognize as legitimate.

¶27 In the present case, Moody was granted probation on certain conditions of which she was "unambiguously" aware. Her expectation of privacy during her period of supervision, like Knights' and Samson's, was significantly diminished. Although the dissent likens Moody's plight to that of a prisoner in a cell, that is not our holding. A prisoner in a cell has no expectation of privacy. *See Samson*; *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S. Ct. 733 (1985); and *Hudson v. Palmer*, 468 U.S. 517, 104 S. Ct. 3194 (1984). Under our holding today, a probationer has an expectation of privacy during her period of supervision, albeit significantly diminished. The enclosed areas of a probationer's residence (closets, cabinets, drawers and the like) cannot be searched without reasonable cause.

¶28 In conclusion, we hold that home visits, as a routine and reasonable element of supervising a convicted person serving a term of supervised release, are not searches and are thus not subject to the reasonable cause standard. The District Court, in requiring that Moody consent to home visits as a condition of probation, did not violate Moody's constitutional rights to privacy or right to be free from unreasonable searches.

¶29 **2. Did the District Court properly impose a travel restriction as a condition of Moody's probation?**

¶30 Moody also insists that the District Court erred by imposing Condition 3, requiring that she obtain written permission from her probation officer before leaving her assigned district. Although Moody concedes that this condition does not absolutely limit her travel beyond the multi-county district, she nonetheless argues that the condition improperly places her rights at the mercy of the supervising officer. We disagree.

¶31 Since probation is a form of punishment, probationers do not enjoy the absolute liberty afforded every citizen; rather, they are subject to conditional liberty properly dependent on special restrictions. *Beaudry*, 282 Mont. at 229, 937 P.2d at 461. We have held that for a condition to be reasonably related to the objectives of rehabilitation and protection of the victim and society, a sentencing condition "must have some correlation or connection to the underlying offense for which the defendant is being sentenced." *State v. Malloy*, 2004 MT 377, ¶ 8, 325 Mont. 86, ¶ 8, 103 P.3d 1064, ¶ 8. This of course requires analyzing the condition in the context of the charged offense. To be legitimate, the condition must both rehabilitate the defendant and help protect society from further similar conduct. *Malloy*, ¶ 8.

¶32 In this case, the offense resulted from Moody's admitted problem with alcohol. Unless Moody maintains sobriety, she is likely to re-offend. The deferred sentence permitted Moody the opportunity to address her chemical dependency under the *supervision* of the probation office. This supervision properly includes a travel restriction to allow Moody's probation officer to effectively keep track of her whereabouts in order to ensure that she remains on course with treatment. The travel restriction does not prohibit Moody from leaving her assigned district, it merely requires written permission

12

from her probation officer. In light of our mandate that a probation restriction both rehabilitate the defendant and help protect society from further similar conduct, we conclude that the District Court properly imposed Condition 3.

¶33 Affirmed.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ BRIAN MORRIS

Justice James C. Nelson, concurring and dissenting.

¶34 I concur in the Court's resolution of Issue 2, but I dissent from its decision on Issue 1.

¶35 I cannot agree that a "home visit"[1] is not a search. We have defined a "search" as "a visual examination, or the use of some other means of gathering evidence, which infringes upon a person's reasonable expectation of privacy." *State v. Carlson*, 198 Mont. 113, 119, 644 P.2d 498, 501 (1982); *accord State v. Scheetz*, 286 Mont. 41, 46, 950 P.2d 722, 724-25 (1997); *State v. Elison*, 2000 MT 288, ¶ 48, 302 Mont. 228, ¶ 48, 14 P.3d 456, ¶ 48; *State v. Roper*, 2001 MT 96, ¶ 14, 305 Mont. 212, ¶ 14, 26 P.3d 741, ¶ 14; *State v. Boyer*, 2002 MT 33, ¶ 39, 308 Mont. 276, ¶ 39, 42 P.3d 771, ¶ 39. For

---

[1] The Department of Corrections uses the term "home contact" in its procedures manual. However, the parties and the Court use the term "home visit"; thus, for consistency, I also am using the term "home visit."

13

instance, in *Hulse v. State, Dept. of Justice*, 1998 MT 108, 289 Mont. 1, 961 P.2d 75, we held that field sobriety tests, which "create a situation in which police officers may *observe* certain aspects of an individual's physical and psychological condition *which would not otherwise be observable*," *Hulse*, ¶ 32 (emphases added), constitute a search "because an individual's constitutionally protected privacy interests are implicated in both the process of conducting the field sobriety tests and in the information disclosed by the tests," *Hulse*, ¶ 33. We also based this conclusion on the fact that "law enforcement officers use field sobriety tests *as investigative tools to assist them* in discovering and arresting persons driving under the influence of alcohol." *Hulse*, ¶ 32 (emphasis added).

¶36    When determining whether there has been an unlawful governmental intrusion into one's privacy in search and seizure situations, we look at the following factors:

> (1) whether the person has an actual expectation of privacy; (2) whether society is willing to recognize that expectation as objectively reasonable; and (3) the nature of the State's intrusion.

*Elison*, ¶ 48; *see also Hulse*, ¶ 22; *Scheetz*, 286 Mont. at 48, 950 P.2d at 726.

¶37    In the case at hand, the subject of the search is Moody's home. That a person has an actual expectation of privacy in his or her home, which society is willing to recognize as objectively reasonable, is beyond dispute. Indeed, in *State v. Graham*, 2004 MT 385, 325 Mont. 110, 103 P.3d 1073, we observed that "[a]lthough the right to be free from unreasonable searches and seizures encompasses more than the home, the home, nonetheless, is historically the *raison d'être* for the constitutional protection." *Graham*, ¶ 22. Similarly, in *State v. McLees*, 2000 MT 6, 298 Mont. 15, 994 P.2d 683, we stated as follows:

14

> At the risk of belaboring the obvious, private residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by warrant, and that expectation is plainly one that society is prepared to recognize as justifiable. The fundamental purpose of the Fourth Amendment's prohibition against unreasonable searches and seizures is to protect the privacy and security of individuals and safeguard the sanctity of the home against arbitrary invasions by governmental officials.

*McLees*, ¶ 25 (citation and internal quotation marks omitted). And in *Scheetz*, we recited "the long-standing notion throughout this country, but especially in Montana, that a person's residence and his homestead are secure from unwarranted government intrusion, be it by physical or technological means." *Scheetz*, 286 Mont. at 48, 950 P.2d at 726 (citing *State v. Bullock*, 272 Mont. 361, 901 P.2d 61 (1995), and *State v. Siegal*, 281 Mont. 250, 934 P.2d 176 (1997)).

¶38     Such an expectation of privacy is legitimately held by probationers. *See Griffin v. Wisconsin*, 483 U.S. 868, 875, 107 S.Ct. 3164, 3169 (1987) (The "permissible degree [of impingement upon a probationer's privacy] is not unlimited."); *Griffin*, 483 U.S. at 873, 107 S.Ct. at 3168 ("A probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable.' ").

¶39     As for the nature of the State's intrusion, we consider "whether the state's method of investigation is so personally invasive that we recognize the intrusion as a search that requires further justification, such as a warrant or other special circumstances." *Scheetz*, 286 Mont. at 50, 950 P.2d at 727. Here, even a cursory examination of the Department of Corrections' definition of a "home visit" (*see* the bullet-pointed items in ¶ 16 of the Court's Opinion) discloses that the purpose and extent of this intrusion are to visually "inspect[]" the probationer's home; "observe" activities therein, including evidence of

"contraband, weapons, illegal or dangerous objects"; "assess" the home environment; and otherwise gather evidence of probation violations. (Significantly, nothing in this definition limits the probation officer to plain view observations.) Such an intrusion certainly qualifies as "a visual examination, or the use of some other means of gathering evidence," *Carlson*, 198 Mont. at 119, 644 P.2d at 501, which is "so personally invasive" as to constitute a search, *Scheetz*, 286 Mont. at 50, 950 P.2d at 727—particularly since, as the Court itself acknowledges, the probation officer's purpose is to "enforc[e]" conditions of supervision and "discern[]" any deception by the probationer.

¶40 Thus, given that "[t]he home is the most sanctified of all 'particular places,' " *Graham*, ¶ 22, and that the purpose and extent of a probation officer's "home visit" is to inspect the probationer's home and gather evidence of noncompliance with probation conditions, the impingement on privacy brought about by such an intrusion unquestionably is a "search."

¶41 The Court's contrary conclusion rests on a fundamentally erroneous application of the factors set forth in *Elison*. First, with respect to whether a probationer has an actual expectation of privacy in her home, the Court observes that "probationers do not enjoy the absolute liberty and heightened expectations of privacy afforded every Montana citizen" but, rather, "are subject to conditional liberty properly dependent upon special restrictions" and, thus, have a "diminished expectation of privacy." ¶ 19. These observations, while true, do not establish that a probationer has *no* actual expectation of privacy in her home. Indeed, it goes without saying that a "diminished expectation of privacy" is not a *nonexistent* expectation of privacy. *See State v. 1993 Chevrolet Pickup*,

16

2005 MT 180, ¶ 41, 328 Mont. 10, ¶ 41, 116 P.3d 800, ¶ 41 (Leaphart, J., dissenting) ("While [a] citizen may not expect as much privacy in the garbage that she sets out for collection as, say, the defendants in *Siegal* did in their compound, *this is not to say that she expects none*." (emphasis added, citation omitted)).

¶42 The Court reasons, in addition, that a convicted felon whose probation includes a "clearly expressed" condition that she make her home open and available for a probation officer to visit "does not have an actual expectation of privacy that would preclude home visits." ¶ 19; *see also* ¶ 23 ("A probationer has no reasonable expectation of privacy that would preclude home visits from taking place."). This reasoning and the Court's concomitant reliance on the probationer's " 'unambiguous[]' aware[ness]" of the probation condition, ¶ 19, however, are entirely unavailing.

¶43 For one thing, the Court's observation totally misses the point. The issue at hand is whether the probationer has an actual expectation of privacy in her home, not whether she has an actual expectation of privacy "that would preclude home visits from taking place." No one is arguing that the State is precluded altogether from conducting home visits. Rather, the question is whether a home visit constitutes a "search," which in turn would require further justification—such as a warrant or other special circumstances— not a complete ban. Likewise, no one has suggested that a probationer whose sentence includes the home visit condition could possibly have "an actual expectation that there would be no home visits during the period of supervision." ¶ 20. Obviously, the probationer *does* expect that there will be home visits, given that this is a condition of her

17

probation. Rather, the question, again, is whether such intrusions are so personally invasive that we require further justification for them.

¶44 Moreover, the question of whether an intrusion into a home constitutes a "search" is *not* contingent on whether the State has permitted the homeowner to have a privacy interest therein. Under the Court's flawed reasoning, the State could vitiate every citizen's expectation of privacy by the simple expedient of announcing that, henceforth, homes in this State are subject to suspicionless intrusions under the guise of "home visits." However, as the Supreme Court explained in *Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577 (1979):

> Situations can be imagined, of course, in which [the] two-pronged inquiry [of *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507 (1967)] would provide an inadequate index of Fourth Amendment protection. For example, if the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry, individuals thereafter might not in fact entertain any actual expectation of privacy regarding their homes, papers, and effects. . . . In such circumstances, where an individual's subjective expectations had been "conditioned" by influences alien to well-recognized Fourth Amendment freedoms, *those subjective expectations obviously could play no meaningful role in ascertaining what the scope of Fourth Amendment protection was.* In determining whether a "legitimate expectation of privacy" existed in such cases, a normative inquiry would be proper.

*Smith*, 442 U.S. at 740 n.5, 99 S.Ct. at 2580 n.5 (emphasis added). For this reason, the fact that a probationer's sentence includes a condition that she make her home open for "visits" plays "no meaningful role" in ascertaining whether the probation officer's intrusion constitutes a search—particularly when it is the validity of the probation condition itself that is at issue.

18

¶45   In a similar vein, the Court is also mistaken to suggest that a "home visit" is not a search because the probationer had notice of and consented to this condition on her sentence.  *See* ¶ 19.  To the contrary, the officer's intrusion may be a "search" nonetheless.  *See Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 650, 652, 115 S.Ct. 2386, 2389, 2390 (1995) (holding that random urinalysis drug testing of students participating in interscholastic athletics constitutes a "search" subject to the demands of the Fourth Amendment, even though the students had consented to the testing); *Board of Ed. of Independent Sch. Dist. v. Earls*, 536 U.S. 822, 826, 832, 122 S.Ct. 2559, 2562, 2566 (2002) (holding that students who consent to drug testing in order to participate in any extracurricular activity still have an expectation of privacy, albeit a "limited" expectation).

¶46   Furthermore, it is disingenuous to suggest that the probationer had a meaningful choice *not* to consent to such intrusions on her privacy.  As Justice Stevens succinctly observed in *Samson v. California*, ___ U.S. ___, 126 S.Ct. 2193 (2006):

> [T]he State's argument that a California parolee "consents" to the suspicionless search condition is sophistry.  Whether or not a prisoner can choose to remain in prison rather than be released on parole, he has no "choice" concerning the search condition; he may either remain in prison, where he will be subjected to suspicionless searches, or he may exit prison and still be subject to suspicionless searches.  Accordingly, "to speak of consent in this context is to resort to a manifest fiction, for the [parolee] who purportedly waives his rights by accepting such a condition has little genuine option to refuse."  5 W. LaFave, Search and Seizure:  A Treatise on the Fourth Amendment § 10.10(b), pp. 440-441 (4th ed. 2004).

*Samson*, 126 S.Ct. at 2206 n.4 (Stevens, J., dissenting) (second alteration in original, first citation omitted).

¶47 The same is equally true here. Moody's "choice" was to accept either suspicionless entries into her home or suspicionless entries into her prison cell. Such alternatives are hardly the waiver this Court implies. *See State v. Olson*, 2002 MT 211, ¶ 20, 311 Mont. 270, ¶ 20, 55 P.3d 935, ¶ 20 ("The knowing and *voluntary* consent by a citizen to a search is a recognized exception to the warrant requirement. The prosecution carries the burden of establishing that consent to a warrantless search was *freely and voluntarily given* and *uncontaminated by any express or implied duress or coercion.*" (emphases added, citation omitted)). In any event, the Court's suggestion that a probationer who "consents" to the "home visit" condition on her sentence (because the condition was "clearly expressed" and she was " 'unambiguously' aware" of it when she was "granted" probation) expects only as much privacy in her home as does a prisoner in his cell is, in the final analysis, pure conjecture lacking any foundation.

¶48 With respect to whether a probationer's expectation of privacy in her home is one society is willing to recognize as objectively reasonable, the Court reasons that home visits "ensure that the supervised felon is abiding by the conditions of her probation, thus addressing the problem of recidivism" and that " 'more intensive supervision can reduce recidivism' " (citing *Griffin*, 483 U.S. at 875, 880, 107 S.Ct. at 3168, 3172, and *United States v. Knights*, 534 U.S. 112, 120, 122 S.Ct. 587, 592 (2001)). Yet, these are precisely the rationales undergirding the Supreme Court's approval of the "reasonable grounds" or "reasonable suspicion" standard in *Griffin* and *Knights*. *See Griffin*, 483 U.S. at 875, 878-80, 107 S.Ct. at 3169, 3171-72; *Knights*, 534 U.S. at 119-21, 122 S.Ct. at 591-93.

20

This Court fails to explain why these rationales now, suddenly, justify elimination of the standard altogether.

¶49 Again, the question under the first two *Elison* factors is whether the probationer has an actual expectation of privacy that society is willing to recognize as objectively reasonable. As explained above, private residences are "places in which the individual normally expects privacy free of governmental intrusion not authorized by warrant, and that expectation is plainly one that society is prepared to recognize as justifiable." *McLees*, ¶ 25 (internal quotation marks omitted). The fact that the probationer's expectation of privacy is "diminished" (¶ 19 of the Court's Opinion) merely justifies the lesser standard of "reasonable grounds" approved by the Supreme Court in *Griffin* and *Knights* and adopted by this Court in *State v. Burke*, 235 Mont. 165, 169-71, 766 P.2d 254, 256-57 (1988). It does not justify an intrusion based on no standard whatsoever.

¶50 Lastly, with respect to the nature of the State's intrusion, the Court acknowledges that "home visits" enable a probation officer "to determine whether the individual is abiding by the conditions of probation." ¶ 21. In other words, "home visits" serve verification and evidence-gathering functions—which, heretofore, we have referred to as a "search." To be sure, verifying the probationer's home address and observing the neighborhood for potential public safety issues do not infringe a probationer's reasonable expectation of privacy. Even meeting the probationer's family, which does not necessarily require an intrusion into the probationer's home, is comparatively benign. However, observing the probationer's residence for contraband, weapons, and illegal objects, conducting a visual inspection of the home, and requiring the probationer to

21

submit to breathalyzer or urinalysis screening for use of alcohol and drugs certainly constitute an intrusion into the home by the State which infringes a reasonable expectation of privacy and which should be made only upon "reasonable grounds."

¶51 The Court attempts to bolster the result it reaches here with citations to the same five cases cited in the State's brief for the proposition that a home visit is not a search—namely, *United States v. Workman*, 585 F.2d 1205 (4th Cir. 1978), *Latta v. Fitzharris*, 521 F.2d 246 (9th Cir. 1975), *United States v. Reyes*, 283 F.3d 446 (2nd Cir. 2002), *State v. Guzman*, 990 P.2d 370 (Or.App. 1999), and *Grubbs v. State*, 373 So.2d 905 (Fla. 1979). *See* ¶¶ 22-23. However, the courts in those cases were interpreting the Fourth Amendment (*Workman*, *Latta*, *Reyes*, and *Grubbs*), Oregon statutes (*Guzman*), and the Florida Constitution (*Grubbs*), whereas the issue with which we have been presented, according to this Court, is whether "requiring a probationer to keep her home open and available for the probation officer to visit at all times violate[s] *the Montana Constitution*" (emphasis added). It is axiomatic that *we*, not the United States Courts of Appeals, the Court of Appeals of Oregon, and the Supreme Court of Florida, are the authoritative expositors of the Montana Constitution.

¶52 But, at a more fundamental level, even if the decisions of courts in other jurisdictions based on other constitutional and statutory provisions afford persuasive authority on the issue at hand, the cases cited by this Court at ¶¶ 22-23 are readily distinguishable, in that the "visits" mentioned in those cases either are undefined (in other words, the contours of a "visit" are not stated) or are far less intrusive than the "home visits" under our review. *See Workman*, 585 F.2d at 1207, 1208 (referring generically,

22

and as dictum, to "warrantless visits to the probationer's home or place of employment," while the dispositive issue was "whether a probation officer can conduct warrantless *searches* of his probationer's premises whenever he has *probable cause*" (emphases added)); *Reyes*, 283 F.3d at 451, 457 (addressing "whether Reyes, a convicted person serving a term of federal supervised release, had a legitimate expectation of privacy in his driveway," given that a condition on his sentence was that he permit a probation officer to "visit" him at any time at home or elsewhere and permit confiscation of any contraband observed "in plain view" by the probation officer[2]); *Guzman*, 990 P.2d at 374 ("[T]he authority to conduct a home visit does not carry with it the authority to inspect private areas of the residence."); *Grubbs*, 373 So.2d at 908, 909-10 (also referring to "visit" generically—in other words, without defining the term[3]).

¶53    Simply labeling something a "home visit" does not afford an answer. Because the intrusions at issue in the foregoing cases were, in substance, not as invasive as the "home visit" at issue here, the Court's reliance on those cases is, therefore, misplaced.

¶54    The same is true of the State's conclusory assurance that the Department of Corrections "distinguishes between home visits and probationary searches." The State fails to point to any such distinction in the Department's policies and procedures. Indeed,

---

[2] In *Reyes*, the probation officers "walk[ed] on the driveway toward the backyard to determine whether anyone was at home" and, in so doing, discovered marijuana plants in plain view in Reyes's yard. *Reyes*, 283 F.3d at 450.

[3] Notably, the *Grubbs* court held that evidence discovered in plain view by a probation officer during a "visit" to a probationer's home may be used only in probation violation proceedings; the seized evidence is not admissible to prove a new criminal offense. *Grubbs*, 373 So.2d at 907, 909-10.

the State provides no explanation whatsoever of what a probation officer may do in a probationary search that the officer may *not* do in the course of a home visit. The Court assumes that the probation officer (during a home visit) "may not open drawers, cabinets, closets or the like; nor may the officer rummage through the probationer's belongings."

¶ 24. Yet, such restrictions do not appear anywhere in the Department's policies and procedures concerning supervision of probationers. Rather, the Court has simply inserted its own language, unfortunately created from whole cloth and contrary to the actual record, into the definition of a "home visit." In point of fact, the home visits under our review instruct probation officers, *without qualification*, to "inspect[]" the probationer's home and, during that inspection, to "observe" for evidence of contraband, weapons, and illegal or dangerous objects and "require" the probationer to submit to breathalyzer and urinalysis screening for use of alcohol or drugs—all of which, *in substance*, constitutes a search.

¶55 Notably, *Latta* (cited by the Court at ¶ 22) actually supports the conclusion that a "home visit" is a search. In *Latta*, the Ninth Circuit, in the context of addressing whether a parole officer's "warrantless search of [a parolee's] home violated the Fourth Amendment," *Latta*, 521 F.2d at 248, observed as follows:

> The purposes of the parole system give the parole authorities a special and unique interest in invading the privacy of parolees under their supervision. In order to fulfill his dual responsibilities for helping the parolee to reintegrate into society and evaluating his progress, and for preventing possible further antisocial or criminal conduct by the parolee, it is essential that the parole officer have a thorough understanding of the parolee and his environment, including his personal habits, his relationships with other persons, and what he is doing, both at home and outside it. It is equally important that this information be kept up to date. Much of this

information can be obtained by methods which necessitate little or no invasion of the parolee's privacy, such as interviews with the parolee himself or with his employer, family, or friends and *visits to his house*. However, these techniques have *inherent limitations*. For example, it may be impossible to determine *whether a parolee is using alcohol or narcotics, whether he is keeping weapons or other contraband in his home, whether he is using or preparing to use his home as a base for improper or unlawful activities, whether he is making a real effort to obtain employment, or the general nature of his home environment,* **without conducting some type of search**.

*Latta*, 521 F.2d at 249-50 (emphases added, citations omitted). It is this same information that the probation officers conducting the "home visits" under our consideration seek to obtain: whether the probationer is using alcohol or narcotics, whether she is keeping weapons or other contraband in her home, whether she is using or preparing to use her home as a base for improper or unlawful activities, and the general nature of her home environment—all of which involve "some type of search."

¶56 The Court points out that "home visits" serve important goals and purposes— namely, to "ensure that the supervised felon is abiding by the conditions of her probation"; to "address[] the problem of recidivism"; and to "protect the safety and welfare of society." ¶¶ 20, 21. These observations, however, miss the mark. The purpose of virtually *every* entry into a home by law enforcement is to ensure that the homeowner is abiding by the law or to protect the safety and welfare of society. This does not mean that the entries, therefore, are not searches. Article II, Section 11, does not define a "search" as a mere *un*important impingement upon an individual's privacy. Rather, as explained earlier, the question of whether an intrusion constitutes a "search" depends on whether the person has an actual (subjective) expectation of privacy, whether

25

society is willing to recognize that expectation as objectively reasonable, and the *nature*—not importance—of the State's intrusion. Thus, while home visits may indeed operate as an important check on a probationer's rehabilitation efforts, this fact does not determine the nature of the officer's entry.

¶57 This is not to say that the goals and purposes served by "home visits" are irrelevant. To the contrary, this factor bears on the degree of certainty or suspicion required to support the officer's decision to intrude. *See Knights*, 534 U.S. at 121, 122 S.Ct. at 592 ("Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable."). We previously recognized that the State's operation of a probation system, like its operation of a school, government office, or prison, or its supervision of a regulated industry, " 'presents "special needs" beyond normal law enforcement that may justify departures from the usual warrant and probable cause requirements.' " *Burke*, 235 Mont. at 168-69, 766 P.2d at 256 (quoting *Griffin*, 483 U.S. at 873-74, 107 S.Ct. at 3168). We therefore approved a warrantless probationary search conducted upon "reasonable grounds." *Burke*, 235 Mont. at 169-71, 766 P.2d at 256-57. In so doing, we reasoned that a probation officer "must be able to supervise the probationer, and upon his judgment and expertise, search the probationer's residence or cause it to be searched." *Burke*, 235 Mont. at 171, 766 P.2d at 257.

¶58 The "reasonable grounds" standard was sufficient, we held in *Burke*, to accommodate two often opposing interests: the probation officer's duty to supervise the

probationer and the probationer's reduced, but nevertheless existent, privacy interest.

Quoting *Griffin*, we reasoned as follows:

> [T]he probation agency must be able to act based upon a lesser degree of certainty than the Fourth Amendment would otherwise require in order to intervene before a probationer does damage to himself or society. The agency, moreover, must be able to proceed on the basis of its entire experience with the probationer, and to assess probabilities in the light of its knowledge of his life, character and circumstances.

> *Griffin*, [483 U.S. at 879,] 107 S.Ct. at 3171. Thus, the special needs of the probation system strongly militate toward the "reasonable grounds" standard.

*Burke*, 235 Mont. at 169, 766 P.2d at 256 (first alteration in original).

¶59 With no apparent justification for modifying this balance—indeed, as noted above, the Court merely reiterates the exact rationales by which we approved the "reasonable grounds" standard in the first place, *compare Burke*, 235 Mont. at 169-71, 766 P.2d at 256-57, *with* ¶¶ 17, 20, 21 of the Court's Opinion—the Court today lowers the bar in favor of no standard at all. Now, a probation officer may enter a probationer's home—under the guise of a "home visit"—with no grounds whatsoever, on any basis the officer deems sufficient (or on no basis at all), and in the absence of any programmatic safeguards to ensure evenhandedness.

¶60 Yet, nothing in the record supports the notion that the "reasonable grounds" standard inhibits a probation officer from supervising the probationer or renders the officer's expertise meaningless. Indeed, we adopted the reasonable grounds standard precisely to accommodate probation officers' expertise in supervising probationers. *See Burke*, 235 Mont. at 169, 766 P.2d at 256 (The probation officer's "continued experience

with the probationer," "knowledge of the original offense," and judgment as to "the degree of supervision necessary in each case" "strongly militate toward the 'reasonable grounds' standard."). Moreover, reasonable grounds may be supplied by this very expertise—i.e., individual-specific knowledge, gained through the supervisory relationship, concerning the probationer's criminal history and projected likelihood of re-offending. *See Griffin*, 483 U.S. at 871, 107 S.Ct. at 3167 (noting that the regulation at issue, which the Court upheld, required the officer to consider a variety of factors in determining whether "reasonable grounds" exist, including "the officer's own experience with the probationer"); *Griffin*, 483 U.S. at 879-80, 107 S.Ct. at 3171-72 (suggesting that the reasonable grounds standard accommodates a probation agency's need "to proceed on the basis of its entire experience with the probationer, and to assess probabilities in the light of its knowledge of his life, character, and circumstances").

¶61     It is counterintuitive that, under this Court's decision today, a probation "search" must be based on "reasonable cause," since probationers have conditioned liberty and, therefore, a reduced privacy interest (*see* ¶ 24 of the Court's Opinion; *see also Roper*, ¶ 12); yet, by the simple expedient of calling a "search" a "visit," we do away with the reasonable cause requirement altogether, even though the object of the exercise is precisely the same:  to inspect the home of a person who has conditioned liberty and, therefore, a reduced privacy interest and gather evidence of probation violations.  The fact that the probation officer may rummage through drawers and personal belongings in a "search," but may not do so in a "visit" (*see* ¶ 24 of the Court's Opinion), seems a slender reed of distinction indeed when, during the visit, the probation officer, as a

28

"visitor," may, nevertheless, observe and visually inspect everyone and everything in the home—with no restriction whatsoever in the Department of Corrections' definition of a "home visit" that the officer is limited to "plain view" observations—and require the probationer to give breath and urine samples.

¶62    In sum, I cannot agree that calling something which is, for all intents and purposes, a search a "home visit" necessarily changes what probation officers are actually doing:  seeking and gathering evidence.  Nor can I agree that by the simple expedient of renaming a search a "home visit," the privacy of a presumably innocent probationer becomes subject to *greater* infringement (given that the Court requires *no cause* for a "home visit") than is the privacy of a probationer of whom the probation officer actually has a *reasonable suspicion* of wrongdoing.

¶63    Before concluding, it is appropriate to address the extensive arguments presented to us by Moody and the State based on *Samson v. California*, ___ U.S. ___, 126 S.Ct. 2193 (2006), which the Supreme Court decided on June 19, 2006, shortly after we handed down our original Opinion in the case at hand.  In *Samson*, the Supreme Court held that the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee.  *Samson*, 126 S.Ct. at 2202.  In other words, the Court upheld a search that was based solely on the subject's status as a parolee.  *Samson*, 126 S.Ct. at 2196.  The State argues that in light of this holding, probation officers may conduct "home visits" of probationers without having "reasonable cause" for doing so.  However, neither *Samson*'s holding nor the reasoning behind it sustains the State's position.

¶64    First, *Samson* involved the search of a *parolee*, not a probationer.  Notably, the *Samson* majority went to great lengths to characterize parolees as having "fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment."  *Samson*, 126 S.Ct. at 2198.  *See*, *e.g.*, *Samson*, 126 S.Ct. at 2198 (" '[O]n the Court's continuum of possible punishments, parole is the stronger medicine; ergo, parolees enjoy even less of the average citizen's absolute liberty than do probationers.' " (alteration in original) (quoting *United States v. Cardona*, 903 F.2d 60, 63 (1st Cir. 1990))); *Samson*, 126 S.Ct. at 2201 ("[P]arolees, in contrast to probationers, 'have been sentenced to prison for felonies and released before the end of their prison terms' and are 'deemed to have acted more harmfully than anyone except those felons not released on parole.' " (quoting *United States v. Crawford*, 372 F.3d 1048, 1077 (9th Cir. 2004) (en banc) (Kleinfeld, J., concurring))).

¶65    Thus, the Court in *Samson* did not broaden the holding of *Knights*, *supra*, that "[w]hen an officer has *reasonable suspicion* that a *probationer* subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable."  *Knights*, 534 U.S. at 121, 122 S.Ct. at 593 (emphases added).  Indeed, the question of whether a *probation* search is reasonable under the Fourth Amendment absent "reasonable suspicion" was not before the Court in *Samson*.  *See Samson*, 126 S.Ct. at 2198.

¶66    Second, *Samson* involved a search of Samson's person on a street, not a search of his house.  As explained above, one's expectation of privacy is at its pinnacle in the

home.  *See McLees*, ¶ 25 (The fundamental purpose of the prohibitions against unreasonable searches and seizures "is to protect the privacy and security of individuals and safeguard the sanctity of the home against arbitrary invasions by governmental officials." (internal quotation marks omitted)); *Graham*, ¶ 22 ("[T]he home . . . is historically the *raison d'être* for the constitutional protection.").  To say that a probation officer may enter a probationer's *home* without reasonable cause because a police officer may conduct a suspicionless search of a parolee on the *street* is to disregard entirely the fundamental and crucial difference between these two contexts:  the heightened expectation of privacy in the former.

¶67    Third, the suspicionless search system approved by the Supreme Court in *Samson* did not, in the Court's view, give officers "unbridled discretion to conduct searches." *Samson*, 126 S.Ct. at 2202; *see also Samson*, 126 S.Ct. at 2204 (Stevens, J., dissenting) ("[I]f individualized suspicion is to be jettisoned, it must be replaced with measures to protect against the state actor's unfettered discretion.").  In particular, the Court was satisfied that California prohibited "arbitrary, capricious or harassing" searches.  *Samson*, 126 S.Ct. at 2202 (internal quotation marks omitted).  Thus, the Court rejected the argument that California's parole search law permits "a blanket grant of discretion untethered by any procedural safeguards."  *Samson*, 126 S.Ct. at 2202 (internal quotation marks omitted).

¶68    Unfortunately, the same cannot be said about the "home visits" at issue here, the implementation of which is not constrained by any standards, guidelines, or procedures at all.  Indeed, the only parameters imposed on a probation officer's otherwise unfettered

ability to enter and inspect a probationer's home under the guise of a "home visit" are set forth in this Court's Opinion; namely, the officer "may not open drawers, cabinets, closets or the like" or "rummage through the probationer's belongings"—at least not until the inspection made possible by the officer's suspicionless intrusion into the house has given him or her reasonable cause to begin rummaging (*see* ¶ 24 of the Court's Opinion).

¶69     Finally—and perhaps most fundamentally—*Samson* was decided under the Fourth Amendment, whereas we are bound, in addition, by the provisions of the Montana Constitution. *See State v. Tackitt*, 2003 MT 81, ¶ 17, 315 Mont. 59, ¶ 17, 67 P.3d 295, ¶ 17 ("[S]earch analysis to determine proper constitutional criminal procedure in Montana is typically conducted under Article II, Sections 10 and 11 of the Montana Constitution, in addition to the Fourth Amendment to the United States Constitution."). In this regard, we have frequently stated in the search and seizure context that Montanans are afforded a broader privacy protection under Article II, Sections 10 and 11 of the Montana Constitution than under the Fourth Amendment to the United States Constitution. *See Hulse*, ¶ 25; *State v. Siegal*, 281 Mont. 250, 263, 264, 934 P.2d 176, 183, 184 (1997), *overruled in part on other grounds*, *State v. Kuneff*, 1998 MT 287, ¶ 19, 291 Mont. 474, ¶ 19, 970 P.2d 556, ¶ 19; *State v. Bullock*, 272 Mont. 361, 384, 901 P.2d 61, 75 (1995); *State v. Sawyer*, 174 Mont. 512, 515, 571 P.2d 1131, 1133 (1977), *overruled in part on other grounds*, *State v. Long*, 216 Mont. 65, 67, 71, 700 P.2d 153, 155, 157 (1985). This increased protection is even more closely guarded when the search is conducted in one's home. *Graham*, ¶¶ 19-22. Accordingly, *Samson* does not afford an answer to the question of whether, in this State, probation officers may conduct "home

visits" without reasonable cause for doing so.  *See Scheetz*, 286 Mont. at 47, 950 P.2d at 725 (holding that *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637 (1983), "is not determinative" of whether the government's use of a drug-detecting canine violates the Montana Constitution, since "we have chosen not to 'march lock-step' with the United States Supreme Court, even when applying nearly identical language").

¶70   In conclusion, a probation officer's entry into a probationer's home to conduct a "home visit," as that term is presently defined by the Department of Corrections, constitutes a search.  The Court decides otherwise on the grounds that the probationer was "granted" this condition on her sentence and that home visits are one "commonly imposed" condition of probation.  However, neither of these considerations establishes that the probationer does not have a legitimate expectation of privacy in her home that is infringed by suspicionless intrusions to "inspect[]" and "observe" for evidence of "contraband, weapons, illegal or dangerous objects."  The Court also reasons that home visits "serve to protect the safety and welfare of society."  However, the importance of the goal served by an officer's intrusion into a home does not determine the *nature* of that intrusion and, thus, is not a factor by which we determine whether the intrusion constitutes a search.  Otherwise, the citizens of this State are protected only from *un*important intrusions, and the constitutional protections against unreasonable searches and seizures are meaningless.

¶71   I would require reasonable grounds to conduct the "home visits" at issue here.  I dissent from the Court's contrary conclusion.

/S/ JAMES C. NELSON

33